COMMONWEALTH *vs.* MICHAEL HILL.

Hampden. September 12, 2000. - November 29, 2000.

Present: MARSHALL, C.J., ABRAMS, COWIN, & SOSMAN, JJ.

*Practice, Criminal,* Agreement between prosecutor and witness, Immunity from prosecution, Assistance of counsel. *Witness,* Bias. *Constitutional Law,* Assistance of counsel.

The record of a murder trial supported the conclusion of a Superior Court judge that the prosecution improperly failed to disclose before trial, upon the defendant's request, an agreement between the Commonwealth and a critical witness regarding the disposition of a pending drug trafficking charge, following which the prosecutor failed to advise the court that the witness testified falsely about his motive in testifying and also argued to the jury the witness's lack of motive to lie: the judge correctly concluded that the defendant was deprived of his right to effectively cross-examine the witness as to bias and correctly allowed the defendant's motion for a new trial. [709-717]

A Superior Court judge correctly concluded that a criminal defendant's trial counsel's failure to call a certain witness was manifestly unreasonable, depriving the defendant of an available, substantial ground of defense. [717-719]

INDICTMENT found and returned in the Superior Court Department on January 17, 1995.

The case was tried before *Francis X. Spina,* J., and a motion for a new trial was heard by *Constance M. Sweeney,* J.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

*Terry Scott Nagel* (*Fredric Bartman* with him) for the defendant.

COWIN, J. On January 12, 1996, a jury convicted the defendant, Michael Hill, of murder in the first degree by reason of deliberate premeditation.[1] The defendant appealed; appellate proceedings were stayed when a motion for a new trial was

---

[1] The jury rejected the theory of felony-murder based on armed assault in a dwelling.

filed. The case was remanded to the Superior Court, where a judge other than the trial judge[2] held an evidentiary hearing on the motion for a new trial.

On June 8, 1999, the judge allowed the motion for the following reasons: (1) the Commonwealth failed to disclose an arrangement to give favorable consideration to Israel Lewis (Lewis), a key witness, and did not rectify Lewis's false trial testimony concerning the lack of such an arrangement; and (2) defense counsel did not call Jose Ramos (Ramos) to testify, even though he had witnessed some of the events surrounding the murder. The Commonwealth's appeal from the allowance of the motion for a new trial is now before us.

I. *Background.*

Prior to trial, in response to the allowance of defense discovery requests, the Commonwealth had been ordered to disclose any "*Brady* material"[3] and "the contents of statements and/or suggestions (oral and/or written) of promises, inducements, and/or rewards to be made or furnished to any witnesses whom the Commonwealth intends to call at trial." The Commonwealth's *sole* written response to these motions was a statement filed with the court on October 27, 1995, that the Commonwealth "is not aware of any evidence of an exculpatory nature . . . in the possession or control of the Commonwealth" and that the Commonwealth recognized "its continuing duty to disclose" any exculpatory evidence.

The Commonwealth's theory at trial was that the defendant and an accomplice, Robert Shular (Shular), broke into the apartment of Lewis, a known drug dealer, intending to steal money or drugs. While in the apartment, Shular and the defendant were confronted by the victim, Lewis's grandfather. A struggle ensued between Shular and the victim, during which the defendant shot the victim in the back.

We summarize the facts the jury could have found and the trial proceedings. In July, 1994, Lewis lived at 32 Lebanon Street in Springfield on the second floor of a two-family home owned by his grandmother. Lewis used his apartment for storing and selling drugs. The victim and his wife, apparently

---

[2]The trial judge was no longer sitting in the Superior Court.

[3]By "*Brady* material," we assume the judge meant "evidence favorable to an accused . . . [which is] material either to guilt or to punishment." *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963).

unaware of their grandson's criminal activity, lived in the apartment downstairs.

Sometime between late at night on July 22, 1994, and the early morning of July 23, 1994, the victim was shot to death in Lewis's second-floor apartment. During a search of Lewis's apartment after the discovery of the victim's body, the police found a large quantity of crack cocaine, later analyzed as weighing over 260 grams and almost eighty per cent pure. Lewis, who was not at home at the time of the murder, departed for Atlanta, Georgia, on learning of his grandfather's death. He later turned himself in on a warrant for his arrest for trafficking in cocaine in an amount of 200 grams or more, G. L. c. 94C, § 32E (*b*) (4), a charge based on the drugs found in his second-floor apartment.

Lewis then cooperated with the police. His information led them to 61 Nelson Avenue, a "crack house," where Shular and the defendant stayed at least once a week. During a search of that house, the police found a silver .380 caliber semiautomatic handgun beneath a pile of garbage in a closet in the room that the defendant and Shular regularly occupied. A ballistics expert later established that this gun was the murder weapon.

Kimberly Ingram (Ingram), a drug and alcohol abuser, who had known the defendant for about one year, had a conversation with the defendant at the crack house in November, 1994, during which the defendant told Ingram that he had shot the victim.[4]

Richard Williams (Williams), a cousin of Robert Shular, was in an automobile with the defendant and Jimmie Lee Perkins, also known as "Dink," sometime after the murder. Dink stated that he, Schular, and the defendant had gone to Lewis's apartment to commit a burglary; "[s]omebody was up"; Shular had "wrestl[ed]" with the victim, and "[s]omething went wrong." In January, 1995, Williams gave a statement to the police concerning this conversation and identified photographs of Dink, Shular, and the defendant.

The defendant and Shular were regular customers of Lewis, and the defendant worked for him, selling $200 to $400 of cocaine a week. Although the defendant had never been inside

---

[4]On cross-examination, Ingram denied that the defendant had made the statement, but reaffirmed it on redirect. During a voir dire held to inquire into her wavering testimony, Ingram stated that a couple of days before testifying she received telephone calls threatening harm to her children if she came to court.

Lewis's house to conduct business, Lewis believed that he had been on the porch. Lewis was concerned about being robbed by his customers, in particular, Dink, who was the defendant's best friend. According to Lewis, Dink, who owned a red car, had a reputation for robbing drug dealers. Lewis claimed that $7,500, stuffed in the couch in his apartment, was missing, apparently stolen on the night of the murder.

On cross-examination, defense counsel asked Lewis:[5] "[y]ou don't think it's a little strange that you're in jail and you haven't been sentenced yet for drug trafficking, which is a mandatory?"[6] Lewis responded: "It doesn't matter to me, because I was out of jail when I testified the first time. I'm testifying because I want to testify, because my grandfather got killed." Trial counsel asked, "And you're not here looking for — well . . . ." Lewis responded: "I'm not looking for anything but to rectify what happened to my grandfather, because I loved him and he was there for me. It doesn't matter how much time I get. I would do this anyway." Trial counsel did not pursue this line of questioning further and the trial prosecutor did not inform the judge that Lewis had been offered consideration for his testimony.

The defendant testified to an alibi, corroborated by his godmother and a young woman named Stacy Mary Bosworth (Bosworth), and supported by documentary evidence. The testimony was that the defendant went to his godmother's house for dinner on July 22, 1994, between 7:30 P.M and 8 P.M, met Bosworth at 11:30 P.M., and the two went to a Days Inn motel, driven by a friend. They checked in at 1 A.M., called a taxicab to pick them up at 5 A.M, and the defendant left for a trip to an amusement park in New Jersey later that morning.

The defendant's godmother confirmed that the defendant was at her house from about 8 P.M. until 11 P.M. on July 22, 1994. Stacy Bosworth testified that the defendant was with her from sometime between 11 P.M. and midnight on July 22, 1994, until the next morning and that they spent the night together at a Days Inn, checking in at 1 A.M. on July 23. Bosworth did not

---

[5]We recount Lewis's testimony in some detail because he was the cooperating witness who formed the basis for the judge's allowance of the motion for a new trial.

[6]The offense with which Lewis was charged was punishable by a fifteen-year minimum mandatory sentence.

explain why the motel records showed their check-in time at 1 A.M. on July 22, when confronted with this discrepancy.[7]

The owner of the taxicab company authenticated records indicating that one of his drivers was dispatched at 5:15 A.M. on July 23 for a fare from the motel to Bosworth's address.

## II. *Posttrial Proceedings.*

A. *Lewis's plea hearing.* Eight months after the defendant's conviction, Lewis sought to enforce an alleged plea agreement with the Commonwealth to dismiss the trafficking indictment in exchange for his testimony at the Shular and Hill trials.[8] The judge (who was the same judge later assigned to hear the instant motion for a new trial) conducted a hearing to determine whether the Commonwealth had entered into such an agreement with Lewis. During this hearing, the assistant district attorney who prosecuted both the Hill and Shular trials (trial prosecutor)[9] characterized Lewis as a "critical witness" whose testimony during the Shular trial was "very, very helpful."[10] The trial prosecutor stated that the Commonwealth had not offered to dismiss the charge, but that "the quid pro quo was 'if you cooperate we will take it into consideration.' " She explained, "[Lewis] had been told by the police . . . but I let him know, too, that our primary concern was the murder, that we weren't concerned about the drug case at the time; we did appreciate his cooperation and if, in fact, he did cooperate, that would be taken into consideration. . . . [I]t had never been formulated what kind of consideration. . . . I did intend to give him some consideration, but I did not and do not think the consideration means we will forget about it. I think that when the Commonwealth reaches a plea agreement that if fair under the

---

[7]The Commonwealth did not introduce the motel records in evidence, but used them to impeach Bosworth. Evidence at the hearing on the motion for a new trial (that motel check-in industry practice is to record the check-in date as the pre-midnight date, even if guest arrival is after midnight) explained the apparent variance between the motel records and Bosworth's testimony.

[8]Shular's trial took place approximately three months prior to Hill's trial.

[9]The prosecutor originally assigned to the Shular and Hill cases (first prosecutor) was later replaced by another prosecutor who prepared the Commonwealth's responses to the pretrial discovery orders at issue here and represented the Commonwealth at trial (trial prosecutor).

[10]During the sentencing phase of the hearing, the Commonwealth, represented by another assistant district attorney, described Lewis's cooperation as "considerable."

circumstances, takes into account what a defendant has done both on the criminal side and as far as cooperation is concerned, that the Commonwealth is living up to its word." Although at the time of the plea hearing the judge concluded that no agreement to dismiss the charge existed, she found that there was a "loose" agreement that "consideration be shown," and that the Commonwealth's offer of a plea to a lesser included charge with a recommendation of two years in a house of correction was adequate consideration in light of the fifteen-year, minimum mandatory sentence Lewis had been facing. Lewis pleaded guilty to the lesser charge of possession of cocaine with intent to distribute[11] and received a sentence of two and one-half years in a house of correction.[12]

B. *Motion for a new trial.* The defendant's motion for a new trial raised five issues: (1) the Commonwealth had failed to disclose an agreement between the Commonwealth and Lewis, exchanging favorable consideration for Lewis's testimony; (2) the defendant received ineffective assistance of counsel because trial counsel failed to call Ramos who would have contradicted the Commonwealth's theory of the case; (3) the Commonwealth improperly impeached a defense witness with false evidence; (4) the trial judge improperly admitted in evidence alleged adopted admissions of the defendant; and (5) the prosecutor's closing argument was improper because it was based on facts not in evidence.[13]

1. *Failure to disclose arrangement with Lewis.* The judge allowed the motion for a new trial in part because of the Commonwealth's failure to disclose its arrangement with Lewis. She concluded that the defendant was prejudiced by this failure because there was "more than a reasonable likelihood" that Lewis's testimony affected the verdict. The judge's findings, which are supported by the record, are summarized below. "When, as here, the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses

---

[11]Lewis also pleaded guilty to two unrelated charges.

[12]The record does not reveal why the sentence imposed (which was the one ultimately recommended by the Commonwealth) was two and one-half years in a house of correction, rather than two years.

[13]The ineffective assistance of counsel argument was set forth in a motion to amend the original motion for a new trial. The motion to amend was allowed, and evidence was presented on this issue at the hearing.

at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). As in the *Grace* case, "[w]e note that the motion judge here gave thorough attention to the entire record and that the issues depended largely on what was presented at the hearing on the motion for a new trial." *Id.* We consider whether the motion judge committed an error of law or other abuse of discretion in allowing the defendant's motion for a new trial. *Commonwealth* v. *Martin*, 427 Mass. 816, 817 (1998), citing *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).[14]

With regard to the existence of the Commonwealth's agreement with Lewis, the hearing judge credited the testimony of Attorney John S. Ferrara (Mr. Ferrara) because it was detailed, deliberate, and consistent throughout. Mr. Ferrara had represented Lewis in the negotiations with the Commonwealth concerning Lewis's cooperation in the Hill and Shular prosecutions. The judge found that "the Commonwealth led Mr. Ferrara and Lewis to believe that the drug charges against Lewis would be dropped."[15] This conclusion was based on her finding that the first prosecutor (see note 9, *supra*), represented to Mr.

---

[14]When a motion for a new trial is denied and is considered by this court in conjunction with a defendant's direct appeal from a conviction of murder in the first degree, we review it under the substantial likelihood of a miscarriage of justice standard required by G. L. c. 278, § 33E. See *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999). That standard applies because the direct appeal is before us at the same time as the denial of the motion for a new trial. When the defendant has prevailed on a motion for a new trial after a conviction of murder in the first degree and the Commonwealth appeals from the allowance of said motion, as is the case here, we review under the standard of error of law or other abuse of discretion, the same standard as any other motion for a new trial. See *Commonwealth* v. *Martin*, 427 Mass. 816, 817-818 & n.2 (1998). In this situation, the § 33E standard does not apply, for, if we affirm the allowance of the motion and the defendant is convicted at retrial, he receives § 33E review on appeal.

[15]Mr. Ferrara testified at the hearing and also submitted an affidavit on which the motion judge relied. According to Mr. Ferrara, the Commonwealth gave him the following assurances: (1) the first prosecutor told him prior to the Shular trial that, if Lewis continued to cooperate, "the drug charges would not be pursued"; (2) as the date of the Shular trial approached, the trial prosecutor told Mr. Ferrara that Lewis was continuing to cooperate and that Mr. Ferrara "need not worry about the [Lewis] case"; (3) after the Shular trial, the trial prosecutor told Mr. Ferrara, "Don't worry, [Lewis] did the right thing, we'll do the right thing"; and (4) following the Hill trial, the trial prosecutor stated that she was pleased with Lewis's cooperation and testimony and that Mr. Ferrara should not worry about the Lewis case.

Ferrara that the trafficking case would not be pursued if substantial cooperation from Lewis were forthcoming.[16] The judge found additionally that, once the trial prosecutor had assumed responsibility for the prosecution of both the Shular and Hill cases in September, 1995, she assured Mr. Ferrara in two different conversations that the Commonwealth was not interested in pursuing Lewis's drug case. The existence of the agreement is also supported by the representations the trial prosecutor made to the judge at Lewis's plea hearing. In addition, the District Court records indicate that the substance of the representations to which Mr. Ferrara testified came to fruition: as Lewis cooperated, the Commonwealth released him on bail and, eventually, recommended termination of his probation on another matter. The judge concluded that representations were made that reasonably could be interpreted either as a promise to dismiss or to file a nolle prosequi of the trafficking charge, or at least, to reduce the charge to a lesser offense in return for Lewis's continued cooperation in the Shular and Hill matters.

The Commonwealth's assertion that it did not enter into an agreement with Lewis is untenable. We agree with the motion judge: "It is clear that Lewis and the Commonwealth entered into an agreement for disposition of the trafficking charges against Lewis . . . before the Shular and Hill trials but [this agreement was] not disclosed to the defendants or their counsel in those cases." The motion judge's conclusion is supported by the record. Although the terms of the agreement were "imperfect in . . . clarity," the motion judge determined that whatever the arrangement between the Commonwealth and Lewis, it was certainly a "material arrangement," see *Commonwealth* v. *Collins*, 386 Mass. 1, 12 (1982). Whether the representation that Lewis's charges would "go away," and should not be cause for "worry," meant that the charges would be dropped or simply reduced (as in fact they eventually were), is irrelevant to the issue here. In either event, as the judge stated, the government was "going to give substantial consideration" to Lewis in return for his testimony against Hill. Further, Lewis "fully expected to get substantial consideration," thus clearly implying that the prosecution was "likely to confer or withhold future advantages

---

[16]The judge concluded that, although the first prosecutor on the Hill and Shular cases, burdened by the pressures of her work assignments, did not remember making these representations to Mr. Ferrara, in fact, such representations were made.

. . . depending on [the] witness'[s] cooperation.'' *Commonwealth* v. *Schand*, 420 Mass. 783, 792, quoting *United States* v. *Buendo*, 701 F. Supp. 937, 942 (D. Mass. 1988), aff'd sub nom. *United States* v. *Penta*, 923 F.2d 839 (1st Cir. 1990). As the hearing judge noted, at the Hill trial, Lewis admitted to ownership of the cocaine found in his apartment and to his intent to sell that cocaine. In addition, the police had overwhelming evidence that Lewis was trafficking in cocaine based on their search of 32 Lebanon Street. The reduction of the trafficking charge against Lewis (with its fifteen-year mandatory minimum) to a charge of possession with intent to distribute a class B substance (for which he received only a two and one-half year sentence to a house of correction) strongly supports the existence of an agreement between Lewis and the Commonwealth. See *Commonwealth* v. *Johnson*, 21 Mass. App. Ct. 28, 40-41 (1985).

The judge further found that this agreement with Lewis was reached before the Shular and Hill trials,[17] but not disclosed to the defendants or their counsel in either of those cases. The judge's determination regarding nondisclosure is supported by the affidavit of Attorney Johnathan R. Elliott, Sr. (Mr. Elliott), Shular's trial counsel.[18] The court record established that there was no formal disclosure to the defense that any inducement or reward had been offered to Lewis. Although both the assistant district attorneys who had prosecuted the case and defense counsel testified at the motion hearing that the Commonwealth provided the defense with oral notice of the Lewis agreement prior to the Hill trial, the judge did not credit this evidence. The judge found the prosecution's testimony to be self-contradictory.

---

[17]The Commonwealth disputes the finding that there was an agreement *before the Shular* trial. The key issue, however, is whether the agreement existed *before the Hill* trial. Nevertheless, the finding that there was an agreement before the Shular trial as well is clearly warranted. Mr. Ferrara testified at the hearing on the motion for a new trial that during the Shular trial he received a telephone call from Lewis who was in the district attorney's office in preparation for testifying at that trial. Lewis was worried because he would have to testify to ownership of the drugs found in his apartment the night of the murder. As a result of Lewis's concern about inculpating himself, Mr. Ferrara had a heated conversation with the district attorney who "conveyed that if Mr. Lewis would not admit to ownership of the drugs on direct [examination], that *all prior understandings* were off" (emphasis supplied).

[18]This affidavit was submitted to the judge at the hearing on the motion for a new trial. Mr. Elliott also testified at the hearing, but only with regard to the issue of calling Ramos as a witness.

In September, 1996, during the hearing on Lewis's motion to enforce the plea agreement, the trial prosecutor stated clearly that she let "him" (Lewis) know that the Commonwealth's main concern was the murder and that the police were not concerned about the drug case at that time. The trial prosecutor further stated, "[W]e did appreciate his cooperation and if, in fact, he did cooperate, that would be taken into consideration." But in a posthearing memorandum submitted to the judge, the Commonwealth reverted to its position that there was no agreement, just that Lewis would be given consideration for his cooperation. Nevertheless, the first prosecutor testified that she had told the trial prosecutor about Lewis's cooperation and that the Commonwealth would consider this fact. Further, Mr. Ferrara testified that Lewis's bail had been reduced by agreement because of his cooperation.

The motion judge did not credit the testimony of defense counsel because of his conflicting statements regarding whether he had received any notice concerning promises made to Lewis.[19] Moreover, during the Hill trial, when Lewis testified and denied the existence of any favorable consideration ("I'm not looking for anything but to rectify what happened to my grandfather . . ."), defense counsel did not press Lewis or seek assistance from the trial judge to confront Lewis's disclaimer. These actions by defense counsel can be explained only by counsel's lack of knowledge regarding such an agreement.

The judge's determination that the agreement had not been

---

[19]Defense counsel testified at various times during the motion hearing that the trial prosecutor told him that Lewis had a pending trafficking charge and that the prosecution might have told him that Lewis's cooperation would be made known to the sentencing judge. The judge also found that defense counsel testified that, one week before the trial, the trial prosecutor told him that Lewis would receive consideration for his testimony. However, defense counsel also testified that he had told appellate counsel for Hill that the prosecution had never made him aware that Lewis would receive any consideration in exchange for his testimony. In an affidavit filed in conjunction with the motion for a new trial, defense counsel stated that he did not receive any discovery from the Commonwealth concerning promises, rewards, or inducements made to Lewis. (It is conceivable that in the affidavit trial counsel was referring only to written "discovery.") Defense counsel volunteered to the court at one point that a recent injury had caused him memory difficulties. Shular's trial counsel submitted an affidavit at the hearing on the motion for a new trial that stated that, despite a request for such information, he was never told by the prosecution that Lewis would receive any consideration in return for his testimony in the Shular case.

disclosed to defense counsel was warranted. "Where there has been conflicting testimony as to a particular event or series of events, a judge's resolution of such conflicting testimony invariably will be accepted." *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), quoting *Commonwealth* v. *Spagnolo*, 17 Mass. App. Ct. 516, 517-518 (1984). The Commonwealth argues that there is no evidentiary support for the finding that it did not disclose orally the consideration for Lewis's cooperation prior to trial. We do not agree. The motion judge specifically did not credit the assertions of defense counsel and the Commonwealth on this subject, but credited the testimony of Mr. Elliott, the court records regarding discovery, and the fact that defense counsel did not cross-examine Lewis concerning any favorable arrangement.[20]

Moreover, as the motion judge concluded, the original failure to disclose the exculpatory material was exacerbated by the fact that the trial prosecutor permitted Lewis to mislead the jury concerning his sentencing expectations at trial and his motive for testifying on behalf of the government. Regardless whether the government has encouraged the false evidence of one of its witnesses, the prosecutor must advise the court of such false testimony. *Commonwealth* v. *Gilday*, 382 Mass. 166, 177 (1980); *Commonwealth* v. *Nelson*, 3 Mass. App. Ct. 90, 100-101 (1975), *S.C.*, 370 Mass. 192 (1976). This the Commonwealth failed to do. To make matters even worse, the trial prosecutor suggested in closing that the jury assess credibility by considering whether a witness has "got something to lose. That's the man (the defendant) who has got something to lose." This argument was made with knowledge that the jury were unaware of an agreement between the Commonwealth and a key witness who had years in prison to lose if he did not "cooperate."

The Commonwealth now argues that Lewis was "an important but not 'critical' witness." It maintains that, because he was not a percipient witness to the murder and did not testify about the defendant's whereabouts on the night of the murder, it is unlikely that his testimony affected the verdict or had an impact on the defendant's decision to testify.

Lewis was a most important link in the evidence against Hill.

---

[20]Although Mr. Elliott testified at the hearing on the motion for a new trial, he was not questioned concerning the statement in his affidavit that he had never received written or oral notice of the Lewis agreement.

His testimony established the defendant's motive; the defendant's knowledge that Lewis was a dealer of large amounts of cocaine who had substantial cash on hand; the defendant's knowledge of Lewis's home; the fact that the defendant was a good friend of the codefendant Shular; that on the night of the murder there was a large amount of cocaine in Lewis's apartment and several thousand dollars and that the money was missing from the apartment after the victim was shot. Moreover, the Commonwealth's assertion that Lewis was not a "critical witness" is contrary to the prosecutor's representation to the judge at Lewis's plea hearing, where she characterized Lewis as a "critical witness" and described his testimony as "very helpful to the Commonwealth" because it "established the motive. . . . [and] established that these people knew what was going on." Further, the testimony of most other Commonwealth witnesses who knew the defendant was confused and self-contradictory. By contrast, Lewis presented consistent and credible testimony (at least measured in the context of the witnesses in this case).[21] Had the defense been aware of Lewis's agreement with the Commonwealth, his testimony would have been subject to severe scrutiny, and he could well have been discredited.

The Commonwealth also contends that defense counsel had an adequate opportunity to cross-examine Lewis about his motive for testifying. This assertion, however, is belied by the fact that counsel lacked knowledge of the agreement to extend favorable consideration. Without knowledge of such an agreement, cross-examination could not be effective.

We agree with the motion judge that the Commonwealth's deliberate failure to disclose its agreement with Lewis, despite requests for such information, was of constitutional dimension. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). "Evidence tending to impeach the credibility of a key prosecution witness is clearly exculpatory." *Commonwealth* v. *Collins*, 386 Mass. 1, 8 (1982), citing *Commonwealth* v. *Baldwin*, 385 Mass. 165, 175 (1982). Understand-

---

[21]Indeed, the Commonwealth benefited further from the fact that Lewis told the jury on cross-examination that he was testifying simply out of remorse and grief at his grandfather's death, unconcerned that he was incriminating himself.

ings, agreements, promises, or any similar arrangements between the government and a significant government witness is exculpatory evidence that must be disclosed. *Commonwealth v. Gilday, supra* at 175. The Commonwealth's failure to disclose this evidence following a "specific and relevant request for exculpatory evidence . . . [is] excused only if 'the error did not influence the jury, or had but very slight effect.' " *Commonwealth v. Collins, supra* at 9, quoting *Commonwealth v. Gilday, supra* at 178. Further, if "through misfeasance or nonfeasance by the prosecutor, false testimony is introduced concerning an arrangement between the witness and the prosecutor, a strict standard of materiality is applied. A conviction will be set aside if there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Commonwealth v. Collins, supra,* quoting *Commonwealth v. Gilday, supra* at 177.

The Commonwealth's failure to disclose exculpatory material that had been specifically requested deprived the defendant of his constitutional right to cross-examine Lewis effectively to show bias due to his expectation of favorable treatment by the Commonwealth on his pending drug case. *Commonwealth v. Schand,* 420 Mass. 783, 792 (1995), quoting *Commonwealth v. Michel,* 367 Mass. 454, 459 (1975), *S.C.,* 381 Mass. 447 (1980). Lacking this information, trial counsel knew only that, at the Shular trial, Lewis had denied any such agreement. The information that trial counsel had received from the Commonwealth (or lack thereof) could only have confirmed that no agreement existed. There was, thus, no purpose for trial counsel to question Lewis further on the subject. The motion judge correctly concluded that, because Lewis was an important government witness, his false testimony could have affected the verdict and that the defendant has shown prejudice by the Commonwealth's deliberate failure to disclose the "consideration."

We take this occasion to emphasize that any communication that suggests preferential treatment to a key government witness in return for that witness's testimony is a matter that must be disclosed by the Commonwealth. *Commonwealth v. Gilday,* 382 Mass. 166, 175 (1980). The fact that the terms of the agreement are not clearly delineated does not insulate the arrangement from disclosure. Indeed, the very nature of the situation may well require that its terms be vague as the consideration given may be dependent on the degree of cooperation. But even

without precise terms, the government easily can induce a witness to believe that his treatment is dependent on his testimony. Thus, if any communication is reasonably susceptible of such an interpretation, it must be disclosed to the defense.

2. *Failure to call Jose Ramos as a witness.* The judge allowed the motion for a new trial in part because defense counsel's failure to call Ramos as a witness constituted ineffective assistance of counsel that prejudiced the defense. Within one week of the murder, the police interviewed Ramos, a fifteen year old boy who lived on the third floor of a house across the street from Lewis's apartment. Ramos's statements were provided to trial counsel in both the Hill and Shular prosecutions.

At Shular's trial, held approximately three months prior to Hill's trial, the Commonwealth's theory was that two men, Hill and Shular, entered Lewis's apartment to commit a burglary. Mr. Elliott presented Ramos's testimony to cast doubt on that theory. Ramos testified that at the time of the murder he was listening to a radio in his room; he looked out his window and saw a small red car stop in front of the victim's house; one man got out of the passenger side and went to a side door of the house that leads upstairs. Ramos returned to his radio, but after about six minutes heard a gunshot and looked back out the window. He saw the man run out the front door and jump into the passenger side of the car. The car then sped away. Ramos did not see the man's face, but testified that he was a tall, black man. He could not testify to the man's exact height.

Shular was acquitted of the murder. On the day of the verdict, Mr. Elliott telephoned defense counsel, informed him of the acquittal and specifically mentioned Ramos's testimony for the defense. Following the telephone call, Mr. Elliott also sent defense counsel a letter informing him of Ramos's new address and that "[i]t might . . . be a good idea to reinterview Jose Ramos." Yet, defense counsel did not call Ramos as a witness at the defendant's trial. At the hearing on the motion for a new trial, defense counsel asserted various reasons for not calling Ramos, including that (1) he could not locate Ramos, (2) in a telephone conversation with Ramos he found him to be extremely "hostile," and (3) Ramos's description of the man entering the house "kind of fit the description" of the defendant. He also told appellate counsel that Ramos was a "crack head."

The motion judge considered whether the failure to call Ra-

mos as a witness might have been a defensible tactical decision. "An attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made." *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998), citing *Commonwealth* v. *Roberts*, 423 Mass. 17, 20 (1996), and *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). The motion judge concluded she could not credit the reasons stated by defense counsel for not calling Ramos. She determined that Ramos was an important and credible witness, based on his testimony at the Shular trial and Mr. Elliott's description of him and of his testimony. She found that there was no reason for him not to have been summonsed for the Hill trial; failure to call Ramos deprived the defense of an apparently impartial witness with no criminal record and no motive to lie. The motion judge concluded that Ramos's observations were of assistance to the defendant because they "contradicted the Commonwealth's two man theory." The motion judge's finding is not clearly erroneous.[22] With no credible explanation for not calling Ramos, the motion judge properly concluded that defense counsel's decision was "manifestly unreasonable." *Commonwealth* v. *Vinnie*, 428 Mass. 161, 171, cert. denied, 525 U.S. 1007 (1998), quoting *Commonwealth* v. *Parker*, 420 Mass. 242, 248 n.7 (1995).

The Commonwealth contends that Ramos would not have helped the defense because the victim's wife testified that the front door was locked and that she had to get the keys to admit the police and emergency personnel. Only the back door was open. Thus, Ramos could not have seen someone entering or leaving through the front door. Discrepancies in any witness's testimony are inevitable. Further, the Commonwealth maintains that Ramos would not help the defendant, as Shular was known as "little" and Hill was known as "fat." The Commonwealth argues that Ramos's description of the man who left the car and entered the house therefore more closely matched the defendant. All that appears from the record is that Hill is taller than Shular. This does not establish that he is "tall," as Shular is only five feet seven inches tall. Further, there is no evidence of Ramos's height to give context to his description of the man. Finally, the Commonwealth contends that, because there was evidence that

---

[22]The motion judge further determined that Ramos's description of the car was "important," because there was testimony at trial that "Jimmie Lee 'Dink' Perkins drove a small two door red car in July, 1994."

the defendant previously had been in a car with "Dink," and that "Dink" drove a red car, calling Ramos could hurt Hill. Few witnesses are totally helpful. Based on the material available to trial counsel, Ramos would have been able to call into question the Commonwealth's entire theory of how the crime occurred. Trial counsel had an opportunity not generally available; he could review Ramos's prior testimony and weigh its value to the defense and even obtain insight into its worth from another attorney who had just tried (and won) the codefendant's case. It was not a reasonable strategic decision not to call Ramos because of any minor problems with his testimony.

We agree with the motion judge that counsel was ineffective in a constitutional sense by failing to call Ramos as a witness. *Commonwealth* v. *Martin, supra* at 822. See *Commonwealth* v. *Haggerty*, 400 Mass. 437, 442-443 (1987). Evidence that contradicted the Commonwealth's entire theory of the case could have raised a reasonable doubt in the jurors' minds. Thus, the defendant was deprived of "an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). "[B]etter work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

III. *Other issues.* The defense makes other claims relating to (a) an adoptive admission based on statements of Richard Williams, (b) the motel records used to impeach the alibi defense, and (c) improper argument by the trial prosecutor. These issues are unlikely to arise at retrial. The context of Williams's statements will be different from what it was at this trial; it is doubtful Williams's testimony could possibly be the same.[23] Accordingly, there is no purpose in our ruling on the issue. The apparent discrepancy in the motel records has now been clarified. Thus, the issue will not arise again. The defendant claims that the trial prosecutor erred in her closing by suggesting that Kimberly Ingram had been intimidated by the defendant's mother. See note 4, *supra.* On voir dire outside the hearing of the jury, Ingram did say that she had received

[23]Williams was a most reluctant witness. His testimony vacillated between denials and partial memories of a conversation that occurred in the defendant's presence. The record is replete with the Commonwealth's attempts to use a statement Williams had given the police alternately to impeach and then to refresh Williams's recollection. This caused his testimony, in the words of the motion judge, to be "almost incomprehensible."

threatening telephone calls, but she did not testify that the defendant's mother contacted her or that the defendant's mother intimidated her in any way. The fact that, after contacting the defendant's mother to obtain defense counsel's address, Ingram wrote a letter to defense counsel stating that she did not remember her statement to the police does not permit the inference that the defendant's mother prompted the writing of that letter or the loss of memory.

IV. *Conclusion.*

The motion judge's order granting the defendant a new trial is affirmed.

*So ordered.*