## COMMONWEALTH *vs.* JOSEPH DeCICCO.

No. 99-P-680.

Suffolk. September 7, 2000. - March 16, 2001.

Present: BROWN, GREENBERG, & DUFFLY, JJ.

*Homicide. Practice, Criminal,* New trial, Opening statement, Argument by prosecutor. *Witness,* Credibility.

At the trial of an arson and murder case, error, if any, in the prosecutor's intentional and perhaps misleading vouching for a Commonwealth witness, a coventurer in the arson that lead to the victim's death, was not shown to have influenced the jury's verdict, in circumstances in which the witness's testimony was not the only evidence upon which the jury could have based its verdict of guilty. [164-166] BROWN, J., dissenting, was of the opinion that there was not sufficient other evidence to assure conviction and that the prosecutor's conduct was so improper as to warrant reversal.

INDICTMENTS found and returned in the Superior Court Department on January 26, 1994, and January 27, 1994, respectively.

Following review by this court, 44 Mass. App. Ct. 111 (1998), a motion for new trial, filed on January 7, 1999, was heard by *Constance M. Sweeney,* J.

*Stephen B. Hrones* for the defendant.

*Jane A. Sullivan,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. Following a January, 1994, firebombing of a wood frame house that led to the death of Wayne Hilliard of Revere, the defendant was convicted of second degree murder and other related crimes. His conviction was upheld on appeal, 44 Mass. App. Ct. 111 (1998). Buttressing the Commonwealth's case was the testimony of George Madden. In a motion for new trial filed on January 7, 1999, the defendant argued that the prosecutor, in his opening and closing statements, impermissibly bolstered Madden's credibility by misrepresenting to the

jury that no deal had been made in exchange for Madden's testimony against him.[1]

The framework of facts that resulted in the defendant's conviction was amply described in our earlier opinion. To give context to the issues raised in this appeal, we restate some of them. Wayne Hilliard was the victim in this case. His father, Robert, and the defendant met in 1993. They soon became bad companions. The elder Hilliard purchased cocaine with his retirement checks which was shared with the defendant and Madden. The good times ended in 1993 when Robert exhausted his savings on cocaine and stopped supplying the defendant and Madden. Their disaffection burst into violence on January 16, 1994. A neighbor of Robert was turning in for the night when she glanced through her window. She saw a man "put a light in [Hilliard's] sun parlor window . . . and then there was an explosion." *Commonwealth* v. *DeCicco,* 44 Mass. App. Ct. 111, 113 (1998). She was not able to give the police a description of the man.

The defendant was among those at the scene of the blaze. He

---

[1] In his opening, the prosecutor stated, "You will hear from [George Madden] that no promises have been made to him, that once this trial is over, he is going to trial, too, charged with first degree murder. . . . He will tell you . . . that after this trial, he will be charged. There's no other promises, no other rewards, no other inducements."

In his closing, the prosecutor stated, "George Madden, he's being charged and he's going to be charged, as he told you on the stand, with first degree murder when he's finished. . . . [H]e will be tried for first degree murder as a joint venturer . . . . What does he have to gain? Both [Mr. Madden and the defendant] point at the other guy [on the tape], but both of them are really in this together. . . . Both of them are just as guilty on the joint venture theory . . . . [Mr. Madden's] not getting a deal from this D.A.'s office on that."

The defendant received a life sentence on the murder charge with a concurrent sentence of fifteen to twenty years on the remaining arson charge (one charge has been dismissed on appeal, *Commonwealth* v. *DeCicco,* 44 Mass. App. Ct. 111, 125 [1998]); consecutive sentences of three to four years on three counts of injuring a firefighter to be served concurrently; and concurrent sentences of three to five years on all other charges.

Eleven months after the defendant's trial, Madden pleaded guilty to a reduced charge of manslaughter, armed assault with intent to murder, two counts of arson, and at least one count of injury to a firefighter. Compared to the defendant, he fared much better. In exchange for his pleas, Madden received concurrent sentences of twelve to twenty years to State prison on a reduced charge of manslaughter and consecutive two to three year sentences on the remaining indictments. That disposition gave him a parole eligibility date that was significantly earlier than that of the defendant.

was visibly inebriated, and a police officer placed him in protective custody. Shortly thereafter, police received reports that Madden had also been at the scene in the same condition, and he too was taken into protective custody. In interviews at the police station on the same day, each suspect claimed that the other had thrown the "Molotov cocktail" that ignited the fire.

A grand jury indicted both Madden and the defendant for first degree murder and other charges. Their trials were severed, and the Commonwealth decided to try the defendant's case first. On November 24, 1994, a jury in the Superior Court convicted the defendant of second degree murder.[2]

First, we note that the motion judge, who also presided at the defendant's trial, was correct when she ruled that the defendant could have raised in his direct appeal the issue whether the prosecutor misled the jury. As she points out (in a margin note), disposition of Madden's plea occurred (on October 3, 1995) "long before the defendant's direct appeal was argued." The defendant's first appellate counsel was privy to that circumstance as it was disclosed in the Commonwealth's brief. Therefore, it was possible to have incorporated the argument now proposed into the direct appeal.

An appellate court will not normally review issues raised by a motion for postconviction relief where such issues could have been raised during trial or upon direct review but were not. See *Commonwealth* v. *Amirault*, 424 Mass. 618, 639 (1997). Although it is a fundamental right to a fair trial that prosecutors refrain from making improper or prejudicial remarks to a jury in an opening or in summation, the defendant's failure to raise the point either at trial or on direct appeal implicates the possibility of waiver. In this case, therefore, we consider the strength of the Commonwealth's case against the defendant, the nature of the claimed prosecutorial misconduct, and whether the prosecutor's mistake is "sufficiently significant in the context of

---

[2]The defendant was also found guilty on indictments charging him with assault with a dangerous weapon (an open flame), G. L. c. 265, § 15B(*b*); three counts of injury to a firefighter, G. L. c. 265, § 13D$\frac{1}{2}$; possession of an infernal machine, G. L. c. 266, § 102A (dismissed on appeal, *DeCicco, supra* at 125); possession of an illegal container of flammable liquid, G. L. c. 266, § 102B; and possession of an explosive device with intent to destroy or damage property, G. L. c. 266, § 102.

the trial to make plausible an inference that the [jury's] result might have been otherwise but for the error." *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986). *Amirault, supra* at 650.

In her handwritten margin note denying the defendant's motion the judge also wrote, "The jury was aware that Mr. Madden had not been tried and could assess that information as they chose. There was nothing before this court then — or now — to support the defense contention that the Commonwealth misrepresented its intent [with] respect to Madden during the course of the defendant's trial." What is wrong with the judge's point is that it rips the prosecutor's categorical statements concerning the principal witness's testimony from their context. At trial, the defense counsel had no reason to question the prosecutor's assertions that Madden would, in fact, be tried for murder. While it is true that the jurors may have been aware that Madden had not been tried, as laypersons, they could not know of the prosecutor's power to make plea concessions which, as happened here, would result in a more lenient sentence and an earlier parole release date than that afforded the defendant. Further, the judge's failure to instruct the jury of this possibility stems from the prosecutor's express denial that he had made any deals with Madden. For that reason, the jury may have assumed that to be the case. A reasonable juror, conscientiously attempting to weigh Madden's credibility, would have assumed that the prosecutor's disclaimer of any inducement offer was unassailable. Thus, the jury was left with the impression that Madden had nothing to gain by his testimony.

In an analogous line of cases, the Supreme Judicial Court has held that, when a prosecution witness testifies pursuant to a plea agreement containing a promise to tell the truth, and the jury are aware of the promise, the judge should warn the jury that the government does not know whether the witness is telling the truth. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989). Although failure to so instruct might not necessarily result in reversible error, the *Ciampa* court held that, "if the prosecutor has vouched for that witness's credibility, such a failure to instruct is reversible error." *Commonwealth* v. *Meuse*, 423 Mass. 831, 833 (1996). See *Commonwealth* v. *Lindsey*, 48

Mass. App. Ct. 641, 645-646 (2000) (finding prosecutor's referral to facts not in evidence an improper intimation that the prosecutor had special knowledge and access to the "truth"). It has also been suggested that, once a prosecutor draws attention to a witness's signed agreement that is contingent on his or her telling the truth, a jury should be told, in no uncertain terms, "that the prosecutor's argument [is] wrong." *Meuse, supra.* In the instant case, neither judge nor defense counsel had any reason to suspect that the prosecutor's prediction concerning Madden's upcoming murder trial would not hold. Therefore, the defendant lost any realistic opportunity of questioning the prosecutor's official pronouncement that Madden would be charged with first degree murder, and there was no need for the judge to give a curative instruction as suggested by the *Meuse* court.

The Commonwealth refers us to the judge's finding that "[t]here was nothing before [her] then — or now — to support the defense contention that the Commonwealth misrepresented its intent [with] respect to Madden during the course of the defendant's trial." It also points out that Madden repeatedly testified that he had not been offered any consideration in exchange for his testimony. We are handicapped — and, so far as appears from the record appendix, so was the judge — by not having been furnished with the details of Madden's plea agreement or an affidavit from him or his defense counsel as to what factors caused him to plead guilty to a manslaughter charge.[3] As we have observed, once the prosecutor had told the jury that Madden would be tried for murder, thereby implying

---

[3]The dissent finds sufficient basis in the ultimate disposition of Madden's case "to infer the secret existence of at least a tacit plea arrangement at the time of trial." *Post* at 166. This conclusion is inconsistent with the motion judge's conclusion that the prosecutor did not misrepresent his intention to try Madden. As in *Commonwealth* v. *Jackson*, 428 Mass. 455, 458-459 (1998), "[t]he defendant's implied contention that some undisclosed inducement existed which, if exposed to the jury, would render [the witness's] testimony less credible, is nothing but surmise." See *Commonwealth* v. *Schand*, 420 Mass. 783, 792-793 (1995) (rejecting defendant's claim of prior inducements as "total[] surmise"). Cf. *Commonwealth* v. *Collins*, 386 Mass. 1, 8 (1982) (finding misrepresentation in prosecutor's implication to jury that there was "nothing he . . . could do" for the witness, where prosecutor had an outstanding offer of a reduced sentence); *Commonwealth* v. *Hill*, 432 Mass. 704, 710-711 (2000) (affirming motion judge's finding that the prosecution failed to

that his testimony against the defendant was unvarnished, it became an impossible task for the defense to contradict the picture so formed.

In some respects, the tactic employed by the Commonwealth in this case parallels *Commonwealth* v. *Jackson*, 428 Mass. 455, 457-458 (1998). In *Jackson*, the prosecutor told the jury that a critical witness for the prosecution would be tried for murder that resulted from a failed drug deal in which Jackson was also a participant. After Jackson's conviction of murder, the charges against the witness were ruled, by a judge, to be insufficiently supported by evidence as a matter of law. In those circumstances, the Supreme Judicial Court held that the defendant's claim that the prosecutor improperly bolstered the credibility of a critical witness failed because the prosecutor "did not mislead the jury in informing them that the Commonwealth had made no deal with the [witness] because the statement was true." *Id.* at 458. Although there are critical distinctions between the two situations, (e.g., the prosecutor in *Jackson* did not play any role in the disposition of the witness's case), turning a potentially equally culpable witness against another always smacks of fundamental unfairness when there is a great disparity in the ultimate dispositions. See *Commonwealth* v. *Ciampa*, 406 Mass. at 261 n.5.

Having highlighted the questionable tactic employed by the prosecutor in this case, we return to the issue of substantial risk and ask if there is serious doubt whether the result of the trial might have been different had the error not been made. See *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999).

Madden's testimony was, of course, damaging in the sense that he placed the defendant at the scene of the fire as the principal actor who ignited the blaze. If Madden's version of

---

disclose exculpatory inducement evidence where the prosecutor assured the witness that the Commonwealth was not interested in pursuing his case prior to his testimony, subsequently released him on bail, and eventually recommended termination of his probation on another matter); *Commonwealth* v. *O'Neil, post* 170 (2001) (defendant deprived of effective assistance of counsel where counsel only vaguely alluded to a document, even if not a contractual plea agreement, encompassing protection in return for a witness's testimony and then failed to utilize the document as evidence in cross-examination or in summation).

events was the only testimony available to make the case against the defendant, the prosecutor's vouching for his credibility would constitute reversible error. In the context of this case, however, we are not persuaded that "the result might have been otherwise but for the error." *Commonwealth* v. *Alphas*, 430 Mass. at 21; *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. at 21; *Commonwealth* v. *Powers*, 36 Mass. App. Ct. 65, 71 (1990). The defendant contends that the prosecutor's erroneous statement went directly to the heart of the case because "without his inculpatory statements, there is no case against [him]" as the principal culprit. However, that was not the only theory on which the defendant's conviction was based. Arson indictments may also be satisfied by showing that a defendant "did aid, counsel, or procure the burning of [a] building." *Commonwealth* v. *DeCicco*, 44 Mass. App. Ct. at 116-117. See *Commonwealth* v. *DeStefano*, 16 Mass. App. Ct. 208, 215 (1983). Even absent Madden's testimony, the jury would not have been precluded from finding that the defendant was a joint participant in the arson. There was ample evidence upon which the jury could have based its verdict against the defendant as a joint venturer even if the jury concluded that Madden was lying to gain a more favored disposition for himself. They could have believed other testimony concerning events surrounding the fire which (1) showed the mutual animus that existed between the defendant and Robert Hilliard and (2) showed that the defendant took a small glass jar and filled it with methanol from a fifty-five gallon drum in the basement of his and Madden's apartment building. *Commonwealth* v. *DeCicco*, 44 Mass. App. Ct. at 114-115. The latter would allow the jury to conclude that the defendant made a "Molotov cocktail" and that, no matter who threw the firebomb, the defendant aided in the burning of the building. Viewed in this context, the prosecutor's attempt to bolster Madden's credibility looms less large than in a case where the prosecution's only theory is that the defendant was the principal actor. Assuming that the prosecutor misled the jury — if true, such behavior was clearly troublesome and improper

— the defendant has not shown that the jury might have reached a different result but for the error.

*Order denying motion for new trial affirmed.*

Brown, J. (dissenting). A pretty fair jurist once quipped that even a dog knows the difference "between being stumbled over and being kicked." Holmes, The Common Law 3 (1881). See *E. Amanti & Sons, Inc. v. Barnstable*, 42 Mass. App. Ct. 773, 778-779 (1997). Were but the line between mistake and calculation always so clear. Where the majority apparently sees a mere stumble on the Commonwealth's part here, I perceive a kick. Accordingly, I dissent.

As noted by the majority, the prosecutor at trial repeatedly bolstered the credibility of the chief government witness, Madden, by assuring the jury that Madden ultimately would be tried for murder and that he had received no promise of lenity. In fact, less than a year later, a plea deal was struck, and Madden was permitted to plead guilty to manslaughter.

It may never be known whether or to what extent the prosecutor had hinted to Madden at the time of the defendant's trial that helpful testimony would be rewarded. The temptation for the prosecutor to engage in such conduct with an indicted but untried witness is plain: the witness then has every incentive to "go all out" in his efforts to please the prosecutor, while the government is permitted to enhance the witness's credibility by touting the lack of a plea agreement.

For me, the ultimate disposition of Madden's case provides a sufficient basis to infer the secret existence of at least a tacit plea arrangement at the time of trial. See *Commonwealth v. Hill*, 432 Mass. 704, 712 (2000) (reduction of the charge "strongly supports the existence of an agreement between [the witness] and the Commonwealth"). Bolstering my conclusion is the fact that in *Commonwealth v. Jackson*, 428 Mass. 455, 457-459 (1998), a prosecutor from the very same office that prosecuted the defendant here, in approximately the same time frame, apparently made a similar arrangement with another

government witness. Cf. *Commonwealth* v. *Johnson*, 21 Mass. App. Ct. 28, 41 (1985). Admittedly, as the majority explains, the charges against the witness in *Jackson* were dismissed on the basis of insufficient evidence (a dismissal the Commonwealth did not appeal), not a plea bargain. I note only that the government exerts complete control over the inculpatory evidence presented at trial.

Even if, later events notwithstanding, it is believed that no inducement was offered to Madden, I still conclude that the government's conduct was grossly improper. Any Superior Court prosecutor should know better than to *guarantee* that a particular defendant ultimately will be tried as indicted. Witnesses disappear, the weight of evidence shifts, eleventh hour plea agreements are reached. For the prosecutor here to state unequivocally and repeatedly that Madden will "go[] to trial, too, charged with first degree murder" was reckless in the extreme. In my view, where a prosecutor makes such an ill-advised promise, a trial judge would be well within his or her right to instruct the jury, sua sponte, that no such guarantee can be enforced against the government.

In determining the correct curative for the prosecutor's conduct, the majority ultimately concludes that even if Madden's testimony were tainted — that is, unfairly bolstered by the Commonwealth — there was sufficient other evidence here to assure conviction, and so no risk of a miscarriage of justice is posed.[1] In the first instance, I am very unclear about what "other evidence" the majority has in mind. Apart from Madden's testimony, the only inculpatory facts adduced by the Commonwealth — circumstantial evidence possibly supporting the inference that the defendant had worn a hat and coat found at the scene that bore traces of an accelerant, as well as vague suggestions that the defendant and the victim's father had been involved in an ongoing dispute — would not even meet the requirements of legal sufficiency. The majority makes much of evidence that the defendant poured a small quantity of methanol

---

[1]For reasons explained in the majority opinion, the substantial risk standard applies here rather than the more favorable harmless error standard that otherwise applies to errors that implicate constitutional rights (here, due process).

into a bottle before the fire was set — a fact the defendant freely admits. It was only through Madden's testimony, however, that the Commonwealth was able to link the filling of the bottle, itself a benign act (the defendant kept a large supply of methanol in his basement which he apparently used for various purposes), to the construction *and* decision to deploy the firebomb used here.[2] Likewise, the majority emphasizes the evidence of the defendant's animus toward the victim's father. There was, however, at least as much evidence of similar antipathy on the part of Madden.

As the Supreme Judicial Court stated in *Commonwealth* v. *Collins*, 386 Mass. 1, 9 (1982), quoting from *Commonwealth* v. *Gilday*, 382 Mass. 166, 177 (1980), if "through misfeasance or nonfeasance by the prosecutor, false testimony is introduced concerning an arrangement between the witness and the prosecutor . . . [a] conviction will be set aside if there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " The Commonwealth here, either through guile or recklessness, purveyed to the jury what ultimately proved to be such false testimony. In view of the weakness of the government's case apart from Madden's testimony, I believe that the misleading evidence concerning Madden's potential motives for bias likely "affected the judgment of the jury," requiring reversal.

More important, however, I conclude that reversal is mandated here in any event — questions of the strength of the evidence notwithstanding — as a normative measure aimed at deterring government malfeasance. While a drastic remedy to be sure, dismissal of indictments is one of the sanctions that may be imposed in response to serious official misconduct. See *Commonwealth* v. *Cinelli*, 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983). I believe the Commonwealth's actions here rose to the requisite level of bad faith to warrant that remedy.

In a criminal trial, the balance of power already is tipped quite heavily in favor of the government. A prosecutor occupies the unique position of being able to offer hesitant witnesses substantial rewards for cooperation (or to inflict terrible penal-

---

[2] The defendant stated that he had intended to use the methanol to clean resin from the crack pipes he and Madden were smoking.

ties for lack of same). A defendant has no similar leverage. Given this inequity, I believe that any abuse by the government of its already formidable power to influence testimony must be met with the harshest possible sanction.

In *Commonwealth* v. *Hill*, 432 Mass. at 709-717, the Supreme Judicial Court ordered a new trial where the prosecutor had failed to disclose a secret plea agreement with a key government witness — an agreement of precisely the same sort that I believe existed here. Specifically, the Commonwealth had made no express promise to the witness, but offered instead to make concessions proportional to the ultimate value of the witness's testimony. Despite this understanding, the prosecutor allowed the witness to tell the jury that no inducements whatsoever had been offered in exchange for his testimony. Fortunately, the witness in *Hill* subsequently confessed the subterfuge.

Unfortunately, in the main, shady practices of the type described in *Hill* seldom come to light. However, when they do, as I believe has happened here, the Commonwealth must be brought up short. In my view, this case marks an appropriate occasion to draw a line in the sand. The majority would not go so far, at least not this time. Accordingly, I dissent.