## COMMONWEALTH *vs.* TOMMY BIRKS.

Hampden. October 5, 2001. - February 5, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Agreement between prosecutor and witness, Instructions to jury, New trial, Judicial discretion, Capital case. *Privileged Communication. Evidence,* Cross-examination, Consciousness of guilt. *Homicide.*

At a criminal trial, the defendant's right to confront and reasonably cross-examine a prosecution witness was not abridged, and the judge did not abuse her discretion, by sustaining a single objection that limited defense counsel's cross-examination of the witness about conversations with his attorney on the subject of promises, rewards, and inducements for the witness's testimony, where any discussion between the prosecution and the . witness was properly disclosed to defense counsel prior to trial and placed before the jury throughout the trial, and where the single question by defense counsel to which an objection was sustained was broad and might well have elicited privileged as well as unprivileged communications. [785-789]

At a criminal trial, a mistrial was unnecessary because of a mistake in the judge's instruction to the jury on consciousness of guilt, where the judge's mistake was adequately corrected by her prompt and strong curative instruction. [789-790]

At a murder trial, the judge did not err in denying the defendant's request for an involuntary manslaughter instruction, where there was insufficient evidence to support such an instruction. [790-791]

On a motion for a new trial in a case of murder in the first degree in which the defendant claimed that implicit in the Commonwealth's promise of "consideration" for a codefendant was a promise of leniency, including the likelihood of being permitted to plead guilty to murder in the second degree or manslaughter, the judge did not abuse her discretion in declining to hold an evidentiary hearing on the motion, where the issue before the judge was adequately presented in the pleadings and affidavits of the parties, and the issues raised in the motion were not substantial. [791-792]

INDICTMENTS found and returned in the Superior Court Department on January 11, 1996.

The cases were tried before *Constance M. Sweeney,* J., and a motion for a new trial, filed on January 28, 1999, was heard by her.

*Myles D. Jacobson* for the defendant.

*Deborah D. Ahlstrom*, Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning hours of December 7, 1995, Jose Sanchez and Felix Colon were gunned down in a Holyoke park, the victims of gang violence. Four men were indicted for their murders. Two of them, Jose Velez and Jason Souza, testified for the Commonwealth. Jose Maldonado and the defendant in this case, Tommy Birks, proceeded to trial. They were tried separately and both were convicted.[1]

Birks was tried and convicted on a theory of joint venture. The evidence supported the Commonwealth's theory that Maldonado was the shooter, and that Birks participated in planning the shootings, retrieved the gun, provided it to Maldonado at the time of the shootings, and was present and willing to provide assistance when the shootings occurred.

Birks appeals from his convictions of murder in the first degree (two indictments) and illegal possession of a firearm (one indictment). He also appeals from the denial of his motion for a new trial, which is now consolidated with his direct appeal. He claims that he was denied his right to confront and fully cross-examine a Commonwealth witness on the subject of promises, rewards, and inducements; that the trial judge erred when she mistakenly referred in her charge to evidence of consciousness of guilt that had been excluded, and then gave a curative instruction suggesting that the evidence was from another case and her comments on it should be completely disregarded; that it was error not to instruct the jury on involuntary manslaughter; and that the judge should have held an evidentiary hearing on the motion for a new trial. Birks also requests that we exercise our power under G. L. c. 278, § 33E, to reduce the degree of his murder convictions to murder in the second degree or manslaughter, or to order a new trial. We find no error, and affirm the judgments.

1. *Facts.* We briefly recite the pertinent facts the jury could have found based on the Commonwealth's evidence, reserving

---

[1]Maldonado's convictions were affirmed on appeal. *Commonwealth* v. *Maldonado*, 429 Mass. 502 (1999).

certain details for discussion in conjunction with the issues raised. Two days before the murders, Birks met with Maldonado, Velez, and Souza, at the apartment of Luz Torres (Cookie). Cookie is the sister of Chino Collazo, a leader of the Latin Kings gang in western Massachusetts. Chino Collazo was then incarcerated in Florida. When they convened at the apartment, Maldonado told them that he had just received instructions from Collazo to kill Sanchez because he had attempted to sexually assault Cookie. Cookie then proceeded to tell the four about her experience with Sanchez. At the end of the meeting, Maldonado announced that he would do the killing.

The next night, Birks, Maldonado, Souza, and Velez encountered Sanchez at a bar in Holyoke; he was with Colon. They drank together throughout the evening. Maldonado told Souza that "it," meaning the killing of Sanchez, "was going to happen tonight," and then spoke to Birks privately. Birks asked Souza to give him a ride to an apartment where he was staying. At the apartment, Birks retrieved a handgun, wiped it down with a cloth, loaded it with bullets, and placed it in his pocket.[2] They returned to the bar, and Birks hid the gun under a seat in Souza's automobile.

Sometime after the bar closed, the group agreed to buy additional beer and continue their drinking at Springdale Park in Holyoke. They traveled in two motor vehicles. Maldonado and Velez rode with Souza. Birks rode with the victims. When the cars stopped at a "bootlegger" so they could buy beer, Birks told Maldonado that the gun was "under the seat" in Souza's car. At the park, everyone got out and continued celebrating, except Maldonado, who remained in Souza's car and retrieved the gun. Suddenly, Maldonado got out of the vehicle, walked over to Colon and Sanchez, and shot each of them in the head, killing them. He then attempted to kill Sanchez's girl friend, Linda Dukas, who had joined the celebration. Dukas was wounded, but recovered.[3] Maldonado, Birks, Velez, and Souza fled the scene in Souza's vehicle.

---

[2] At trial, Souza testified that he recognized the gun as one he had procured for Maldonado several days before.

[3] Immediately after the shooting, Dukas could not speak because of her injuries. She was able to identify the individuals involved in the shooting by

Later that same day, the Holyoke police located Birks and Velez at Velez's sister's apartment. Both were questioned at the police station and released. Birks subsequently went to New York City where he was arrested on a warrant and returned to Massachusetts. During the booking process, Birks asked the booking officer whether it would help his case if he could disclose the location of the gun.

2. *Promises, rewards, and inducements.* The Commonwealth obtained the cooperation of Velez and Souza, and both men testified at the trials of Maldonado and Birks. They were both told that their cooperation in testifying would be "taken into consideration" when it came to disposing of the criminal charges against them. No specific promises as to the consideration that would be given were made to either witness. The Commonwealth disclosed these discussions to Birks's counsel before trial, they were the subject of direct and cross-examination during trial, and the discussions were a prime topic in the closing argument of defense counsel.

The examination and cross-examination of Souza proceeded without controversy. Souza testified for the Commonwealth on direct examination that his understanding was "[t]hat my cooperation will be taken into consideration when it's time to deal with my cases," and that no promises more specific than that had been made to him by the Commonwealth to induce him to testify. On cross-examination, Souza testified that his expectation was that he would "not do life without parole." On redirect examination, he testified that he had never discussed with the Commonwealth either his sentencing or the possibility of pleading guilty to "lesser charges."

Whether defense counsel was improperly restricted in confronting and cross-examining a prosecution witness arose in the context of Velez's testimony. On direct examination, Velez was asked whether he had any arrangement with the Commonwealth "as to what's going to happen to your cases?" He answered, "No." He was then asked, "What is your understand-

identifying photographs and writing on a pad of paper. On December 7, 1995, she was shown a photographic array and picked out Maldonado as the shooter; on December 13, 1995, she picked out Jose Velez and Tommy Birks from two additional photographic arrays.

ing about your cases?" In response he struggled for the word "consideration" to use in his answer. He eventually stated, "I don't know how to say the word. Taken into — I don't know how to say it." The prosecutor then asked, "Did your lawyer explain it to you?" Velez answered, "Yes." At this point the prosecutor asked the following two questions: (1) "Did I ever tell you or did your lawyer ever tell you that I said you were going to get a particular sentence in exchange for testifying?" (Answer, "No"); and (2) "Did your lawyer or myself ever tell you that . . . you were going to be able to plead to something different or something was going to happen different to you as a result of your testifying?" (Answer, "No. No, they didn't").

During cross-examination, Velez agreed that he hoped to get "consideration" for his testimony, and specifically that he hoped "to get a reduced sentence." Defense counsel then asked Velez whether he hoped "to plead to simple manslaughter," to which Velez answered, "I don't know what it is"; at which point counsel asked, "You don't know what it is? Well you had discussions with your attorney; is that correct?" (Answer, "Yes"). The Commonwealth then objected on the basis of "privilege," and the judge sustained the objection without further elaboration. Defense counsel asked no further questions concerning Velez's discussions with counsel, made no offer as to what he was attempting to elicit from the witness, and did not contend that the witness had waived his attorney-client privilege. He did, however, continue to cross-examine the witness about other criminal charges pending against him and elicited testimony that the witness believed he would get "consideration" from the Commonwealth on those charges as well.

Birks now claims that it was error not to permit his counsel to inquire about conversations Velez had with his attorney regarding the possibility of pleading to manslaughter, particularly where the Commonwealth opened up the subject of discussion between Velez and his attorney on direct examination. Birks's right to confront and reasonably cross-examine Velez was not abridged at the trial, nor did the judge abuse her discretion by sustaining a single objection that limited defense counsel's cross-examination of the witness about conversations he had with his attorney.

When the Commonwealth promises anything to a witness to induce him to testify, even though it be no more specific than "consideration" in future proceedings, that communication is a promise, reward, or inducement that must be disclosed to the defendant. *Commonwealth* v. *Hill*, 432 Mass. 704, 716 (2000). The defendant is entitled as a matter of right to reasonable cross-examination of a witness for the purpose of showing bias, *Commonwealth* v. *Michel*, 367 Mass. 454, 459 (1975), *S.C.*, 381 Mass. 447 (1980), and that right includes inquiring into whether a witness expects favorable treatment in return for his testimony. *Commonwealth* v. *DeBrosky*, 363 Mass. 718, 726-727 (1973). "This right of cross-examination may assume constitutional dimensions under the confrontation clause of the Sixth Amendment to the Constitution of the United States, and art. 12 of the Declaration of Rights of the Constitution of the Commonwealth." *Commonwealth* v. *Michel, supra,* and cases cited. If the witness's credibility is a critical issue in the case, the requirements of due process may also mandate that the jury be aware of "evidence of any understanding or agreement as to a future prosecution." *Giglio* v. *United States*, 405 U.S. 150, 155 (1972).[4]

In this case, the discussion between the Commonwealth and the witnesses was properly disclosed to defense counsel prior to trial, and placed before the jury throughout the trial, including through the direct and cross-examination of each of the witnesses. Also placed before the jury was testimony regarding the expectations of the witnesses beyond the generality of "consideration" promised by the Commonwealth. In addition, in her instructions to the jury, the judge specifically instructed them to scrutinize the testimony of these witnesses with caution

---

[4]A related issue arising in cases involving a cooperating codefendant is often not what has been promised by the Commonwealth, but rather what benefit the witness subjectively hopes or expects he might receive when it comes time to dispose of his own case. These hopes and expectations are obviously relevant to the questions of bias and motivation and are also fair game for cross-examination. *Commonwealth* v. *Hamilton*, 426 Mass. 67, 72 (1997). *Commonwealth* v. *Henson*, 394 Mass. 584, 587 (1985). The Commonwealth, however, has no burden to obtain and produce such information, and may itself examine a witness on this subject in order to distinguish such hopes and expectations from promises actually made. *Commonwealth* v. *Hamilton, supra. Commonwealth* v. *Henson, supra.*

and greater care because of the promises of consideration made by the Commonwealth and anticipated by the witnesses. In these circumstances, the broader constitutional concerns regarding due process and the right to adequately confront witnesses to whom promises, rewards, and inducements have been made are satisfied. See *Giglio* v. *United States, supra* at 154-155; *Commonwealth* v. *Hill, supra* at 716-717; *Commonwealth* v. *Michel, supra* at 459-461. The issue before us is thus narrow in scope, involving questions of privilege and the judge's substantial authority and discretion to limit the questioning of witnesses. *Commonwealth* v. *LaVelle,* 414 Mass. 146, 154 (1993), quoting *Commonwealth* v. *Hicks,* 377 Mass. 1, 8 (1979) (right to cross-examine to show bias not infringed if matter sufficiently aired); *Commonwealth* v. *Repoza,* 382 Mass. 119, 125-126 (1980), *S.C.,* 400 Mass. 516, cert. denied, 484 U.S. 935 (1987) (scope of cross-examination rests largely in sound discretion of judge).

The attorney-client privilege, when properly applied, should present no obstacle to inquiring into promises, rewards, and inducements made by the Commonwealth either directly to the witness or through counsel. The communication of such matters by the prosecutor is not privileged, *Commonwealth* v. *Michel, supra* at 460-461, and the details of what the prosecutor told counsel or the witness, or what counsel conveyed from the prosecutor to the witness, are subject to examination without violating attorney-client privilege. Other conversations between the witness and counsel, about whether to accept the terms offered by the prosecutor, or about the possible permutations of "consideration" and how each might affect the witness's future, may well be confidential in nature and subject to the attorney-client privilege. Whether that privilege might ever need to give way to the right of confrontation is an issue we need not decide in this case. *Commonwealth* v. *DiBenedetto,* 427 Mass. 414, 421 (1998) (attorney-client privilege may be invaded only if shown there is no other way "to get at the information").

When Velez was unable to remember or pronounce the word "consideration" during direct examination, the prosecutor attempted another tack. That tack was to question the witness about what his attorney told him the prosecutor had said the

terms of the understanding would or would not be. This was intended neither as an invasion into privileged conversations, nor as an opening for defense counsel to inquire more broadly about discussions between the witness and his attorney concerning acceptance of the Commonwealth's offer.[5] On cross-examination, defense counsel's single question regarding discussions Velez had with his attorney was broad and might well have elicited privileged communications as well as unprivileged communications. In these circumstances, and on objection, the judge acted well within her discretion in sustaining the objection. Counsel did not pursue this line of questioning further or offer the judge any information as to what he was attempting to elicit or what he expected the witness might say in response to further questioning. There was no error. *Commonwealth* v. *DiBenedetto, supra* at 421.

3. *Erroneous jury instruction on consciousness of guilt.* The judge instructed the jury that evidence that Birks was found hiding in a closet at the time of his arrest in New York City could be considered as evidence of consciousness of guilt. No evidence had been introduced to this effect.[6] Birks moved for a mistrial at the conclusion of the main charge. That motion was denied. The judge then gave a curative instruction to the jury, in which she told them that she had mistakenly confused evidence from another case with this one and that evidence of a suspect found in a closet in New York City was entirely unrelated to Birks or the case at hand. Specifically, the judge told the jury as

---

[5] Although the prosecutor's second of two questions on this subject is not on its face limited to communications from the prosecutor to defense counsel, the context clearly suggests what the prosecutor intended to inquire about, and how it was understood. Whether the witness's answer to the question would constitute a waiver of his attorney-client privilege in these circumstances is a close question. See *Commonwealth* v. *Goldman,* 395 Mass. 495, 499-500, cert. denied, 474 U.S. 906 (1985) (witness does not waive attorney-client privilege by testifying about events that happen to have been "topic" of privileged communication). See also Advisory Committee Note to Proposed Mass. R. Evid. 510 (no waiver where witness voluntarily takes stand unless direct testimony discloses "significant part of the privileged matter"). Birks did not assert at trial that the witness had waived his privilege by answering the question on direct examination, and first raised the issue in his motion for a new trial. The judge ruled that there was no waiver. Her finding is not clearly erroneous.

[6] Such evidence had been excluded by the judge on hearsay grounds.

follows: "I made a terrible mistake here. When I was going through my notes on consciousness of guilt, I was referring . . . to an instruction I had recently given in another case having absolutely nothing to do with this case. . . . [Y]ou are to understand clearly that the reference to 'hiding in a closet' has nothing to do with this case, has nothing to do with [the defendant], has nothing to do with the evidence here against [the defendant], whatsoever."

The defendant raises the dual concerns that the judge's statements may have improperly influenced the jury or caused them to base their verdict on facts not in evidence. We are satisfied that in the present case the judge's mistake was adequately corrected by her prompt and strong curative instruction. *Commonwealth* v. *Kilburn*, 426 Mass. 31, 38 (1997), and cases cited (judge may correctly rely on curative instructions as adequate means to correct error and to remedy any prejudice to defendant). Generally, as long as the judge's instructions are prompt and the jury do not hear the inadmissible evidence again, a mistrial is unnecessary. The jury are presumed to follow the instructions of the judge. *Commonwealth* v. *Degro*, 432 Mass. 319, 328 (2000).

4. *Denial of the defendant's request for a manslaughter instruction.* Birks claims the judge erred by denying his request for an involuntary manslaughter instruction because, based on the evidence, a rational jury could have found that the deaths were a result of his reckless conduct. We disagree and conclude that there was insufficient evidence to support such an instruction.

A defendant is guilty of involuntary manslaughter if the homicide with which he is charged is the unintended result "of an act committed with such disregard of its probable harm to another as to amount to wanton or reckless conduct." *Commonwealth* v. *Nichypor*, 419 Mass. 209, 217 (1994). "If any view of the evidence would permit a verdict of manslaughter rather than murder, a manslaughter charge should be given." *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996). Here, the judge refused to give an involuntary manslaughter instruction because "no rational combination of the evidence in this case would support a finding of recklessness on any issue, the linchpin for involuntary manslaughter."

Her ruling was correct. The risk of harm associated with Birks's actions, in retrieving and providing the loaded gun to Maldonado just before the shootings, combined with his specific knowledge of what was planned, could lead only to a finding by the jury that he acted with malice, and not with wanton or reckless conduct.

5. *Denial of motion for a new trial.* In his motion for a new trial, Birks raised three issues: the judge's limitation on the cross-examination of Velez (discussed above); the failure of the Commonwealth to provide a complete description of the promises, rewards, and inducements it offered Souza and Velez; and the Commonwealth's mischaracterization of the promise of "consideration" which it did disclose. In essence, Birks claims that implicit in the Commonwealth's promise of "consideration" was a promise of leniency including the likelihood of being permitted to plead guilty to murder in the second degree or manslaughter. Birks bases this claim on affidavits from several attorneys practicing in Hampden County who conveyed their sense and experience that when codefendants testify in murder cases for the Commonwealth in that county with a promise of "consideration," they in fact get some form of leniency when they ultimately plead guilty, often including the benefit of pleading guilty to lesser offenses. The attorneys also state that the Hampden district attorney's office generally refuses to promise any specific form of consideration or leniency in connection with securing the testimony of codefendants.

Birks's complaint on appeal is that the judge failed to hold an evidentiary hearing on the motion, to resolve what he characterizes as the "fact" issue whether the Commonwealth's promise of "consideration" carried with it an implied promise that the witnesses would be able to plead guilty to a lesser charge.[7] The finding of such an implied promise, Birks argues, would make inadequate the Commonwealth's disclosure of "consideration" as the only promise, reward, or inducement made to the witnesses.

[7]Subsequent to the trials of Birks and Maldonado, Velez and Souza pleaded guilty to manslaughter and other charges. Souza was sentenced to concurrent terms of from six to nine years with five years of probation. Velez was sentenced to concurrent sentences of from seven to twelve years and five years of probation.  ·

A defendant may obtain a new trial under Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979), if it appears that justice may not have been done. "The choice of deciding the motion on the basis of affidavits or hearing oral testimony is left largely to the sound discretion of the judge," *Fogarty* v. *Commonwealth*, 406 Mass. 103, 110 (1989), to which appellate courts generally defer. *Commonwealth* v. *DeVincent*, 421 Mass. 64, 69 (1995). In exercising her discretion, the judge must determine whether the motion or affidavits have raised a "substantial issue" that would require an evidentiary hearing. *Commonwealth* v. *Licata*, 412 Mass. 654, 660 (1992).

The judge found that an evidentiary hearing would not be useful in the resolution of the issues raised in Birk's motion for a new trial. She based this determination on her view that, because it was undisputed that the Commonwealth did not promise any specific form of leniency to the witnesses, the issue ultimately to be decided was an issue of law, i.e., whether the Commonwealth's representation that it would take the witnesses' cooperation into "consideration" should be treated as a specific promise to confer or withhold future advantages to prospective witnesses. She found that "consideration," in the context in which it was used, failed to rise to the level of a specific promise of favorable treatment. Therefore, the Commonwealth's disclosure of promises, rewards, and inducements had been adequate.

It was within the judge's discretion to decline to hold an evidentiary hearing in these circumstances. The issue before the judge was adequately presented in the pleadings and affidavits of the parties, and was properly decided as primarily an issue of law rather than of fact. In addition, the issues raised in the motion for a new trial were not substantial. Both cooperating witnesses testified that, although they were told only that their cooperation would be taken into "consideration," they each expected to receive reduced sentences because of it. In these circumstances the issue of witness bias was fully before the jury.

6. *G. L. c. 278, § 33E, review.* We have reviewed the entire record of the defendant's trial pursuant to G. L. c. 278, § 33E,

including the matters specifically addressed by counsel. We see no reason to reduce the jury's verdict or to order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*