## Commonwealth *vs.* Raymond Rios Rebello.

Hampden. September 7, 2007. - November 27, 2007.

Present: Marshall, C.J., Greaney, Cowin, Cordy, & Botsford, JJ.

*Accessory and Principal. Practice, Criminal,* Agreement between prosecutor and witness, Argument by prosecutor, New trial, Assistance of counsel, Judicial discretion, Capital case, Confrontation of witnesses. *Constitutional Law,* Confrontation of witnesses, Assistance of counsel. *Evidence,* Prior misconduct, Motive.

A Superior Court judge properly denied a criminal defendant's first motion for a new trial, where there was nothing inaccurate or misleading about the prosecutor's statement in his closing argument that it was for a court to determine the guilt or innocence of a key trial witness respecting charges he faced as a codefendant, given that the prosecutor made the statement in good faith (as evidence supported the judge's findings that there had been no tacit agreement between that witness and the Commonwealth that contemplated the dismissal of charges against that witness after he testified at the trials of his various codefendants, and that the attorneys who testified about the events leading up to the dismissal of the indictments against that witness were credible) and sought to explain to the jury that they were free to accept the witness's account as truthful [122-126]; moreover, the essence of that witness's inducement to testify — a written cooperation agreement of vague terms between that witness and the Commonwealth — was before the jury [126-127].

At the criminal trial of charges of accessory before the fact to murder, the admission in evidence of certain testimony concerning drugs and a shooting, while erroneous, did not substantially sway the judgment, where the defendant was not charged with shooting either victim; where the prosecutor's closing argument did not rely on the evidence; where the judge properly instructed the jury on their consideration of the evidence; and where the evidence consisted of three fleeting references in the course of seven days of testimony and a great deal of evidence supporting the jury's verdicts. [127-129]

A Superior Court judge did not abuse her discretion in denying without an evidentiary hearing a criminal defendant's second motion for a new trial, where she was entitled to determine that the motion and the supporting affidavits failed to cast doubt on the effectiveness of the defendant's trial counsel. [129-131]

Indictments found and returned in the Superior Court Department on September 4, 1991.

The cases were tried before *Constance M. Sweeney*, J.; a motion for a new trial, filed on April 9, 2004, was heard by her; and a second motion for a new trial, filed on March 13, 2006, was considered by her.

*Leslie W. O'Brien* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. After a trial that resulted in a hung jury, the defendant was convicted at a second trial on two indictments charging him with being an accessory before the fact to murder in the first degree on a theory of deliberate premeditation.[1] Represented by new counsel, he appeals from these convictions and from the denials of two motions for a new trial. The defendant claims on appeal that (1) omissions and misstatements by the prosecutor, not adequately explored or corrected by defense counsel, misled the jury about the inducements to the key prosecution witness; (2) the trial judge erroneously admitted irrelevant and inflammatory evidence of the defendant's prior bad acts; and (3) the judge also committed error by denying him discovery and an evidentiary hearing on his second motion for a new trial. We reject the defendant's claims and affirm the convictions. After reviewing the entire record pursuant to G. L. c. 278, § 33E, we also decline to exercise our authority to reduce the verdict or grant other relief.

1. *Background.* The Commonwealth presented evidence that would permit the jury to find the following. In 1991, Pedro Ramos was the leader of a large drug operation in the city of Holyoke. The defendant was affiliated with Ramos's organization as a mid-level manager who obtained drugs (heroin and cocaine) from Ramos and distributed them to street-level sellers.

The victims, Guillermo Santiago and Angel Carcano, were acquainted with Ramos, but they were not directly involved with the Ramos drug operation. Santiago lived in the same apartment building in Holyoke where Ramos had set up his operation in two adjacent apartments. Santiago, often helped by Carcano, had done repair work on one of Ramos's vehicles.

---

[1]The Commonwealth also proceeded on the theory of extreme atrocity or cruelty as to one of the victims; the jury rejected this theory.

Jose Pacheco was a good friend of Santiago and also acquainted with Ramos, but also not part of the Ramos drug enterprise. He occasionally worked with Santiago and Carcano fixing vehicles. Pacheco was the Commonwealth's key witness at trial.

On August 15, 1991, nine days before the murders, police executed search warrants at Ramos's two apartments, seizing large amounts of "crack" cocaine, drug processing paraphernalia, and firearms. They arrested Ramos and several of his associates found in one of the apartments.

Ramos and others associated with his organization, including the defendant, came to believe that Santiago and Carcano had tipped off the police about the drug operation in the two apartments. In retaliation, an order went out to kill both men, and the defendant took it on himself to carry out the order. To that end, he recruited two people, Iran Diaz and Fernando Rivera, to carry out the murders, and obtained Pacheco's assistance in luring the victims to their fate.

Pacheco testified to the following at trial. He twice ran into the defendant by chance in the days preceding the murders, and at those encounters the defendant communicated his intent to kill the victims for Ramos; Pacheco told him that he wanted nothing to do with such a plan. On the second encounter, however, Pacheco drove the defendant to a place where he knew Santiago and Carcano would be so that the defendant could see them and would know what they looked like.

Pacheco encountered the defendant a third time late on the night of August 23 or early in the morning of August 24, 1991, and, at the defendant's request, drove the defendant, Diaz, and Rivera to a 7-Eleven store in Holyoke. Once at the store, the defendant instructed Pacheco to find and bring back Santiago and Carcano, threatening Pacheco and his family with death if he did not cooperate. Pacheco drove to Santiago's apartment building, found Santiago and Carcano at the back of the building, and invited them to accompany him to "get high." The two joined Pacheco in his vehicle. On the drive back to the 7-Eleven, Pacheco attempted to warn them of the danger they were in, but, he said, they were too drunk to take him seriously.

On Pacheco's return to the 7-Eleven, Diaz and Rivera entered his car, joining Santiago and Carcano. The defendant did not

get into the vehicle but confirmed that Diaz and Rivera had the "9" (handgun) and repeated his threat to Pacheco. Under direction from Diaz and Rivera and at gunpoint, Pacheco drove to a loading dock in an industrial area in Holyoke where Diaz and Rivera pushed the two victims from the car and ultimately shot them.

Diaz, Rivera, and Pacheco were each indicted on two charges of murder in the first degree and two charges of conspiracy to commit murder; the defendant and Ramos were indicted as accessories before the fact on two charges of murder in the first degree and also on charges of conspiracy.[2]

Different parts of Pacheco's testimony were corroborated at trial by a number of witnesses: Pedro Figueroa, who testified that he was with Pacheco during some of his encounters with the defendant in the week before the murders; Leo Ortiz, who spent time with Pacheco immediately after the murders; and Yolanda Reyes, Diaz's girl friend, who testified that Diaz, Rivera, and the defendant had returned to her apartment in the early morning hours of August 24 in a "bragging" mood. Pacheco's account of the details of the murders was also consistent with the forensic evidence presented by the Commonwealth's expert witnesses.

The defendant's second trial took place in January, 1993. In late 2003, the defendant's present counsel entered an appearance on his behalf in the Superior Court, and filed a motion for a new trial soon thereafter.[3] The judge who had presided over the defendant's trial conducted an evidentiary hearing on that motion and issued a decision denying it in November, 2005; the defendant filed a timely notice of appeal. In March, 2006, the

[2]Diaz and Rivera were tried and convicted before the defendant's two trials. See *Commonwealth* v. *Rivera*, 424 Mass. 266 (1997), cert. denied, 525 U.S. 934 (1998); *Commonwealth* v. *Diaz*, 422 Mass. 269 (1996). Ramos was tried and acquitted of being an accessory before the fact and of conspiracy. As explained in further detail below, after testifying against all of his codefendants in these separate trials, Pacheco moved to dismiss the charges against him. A judge in the Superior Court allowed Pacheco's motion over the Commonwealth's objection in June, 1993.

[3]Soon after his conviction in 1993, the defendant, through his trial counsel, had filed a motion for entry of a not guilty verdict and in the alternative a new trial, but trial counsel ceased to represent the defendant at some point thereafter, and no action was taken on the motion.

defendant filed in this court a second motion for a new trial that was referred to the trial judge and later denied by her without a hearing. The defendant's appeals from his convictions and from these two denials of his new trial motions have been consolidated for review.

2. *Discussion.* a. *Standard of review.* As in the case of a defendant convicted of murder in the first degree, one convicted as an accessory before the fact to murder in the first degree is entitled to review under G. L. c. 278, § 33E. See *Commonwealth* v. *Francis,* 432 Mass. 353, 354 n.1 (2000); *Commonwealth* v. *Angiulo,* 415 Mass. 502, 509-510 (1993).

b. *Alleged inducements to the key witness.* There is no disagreement that the Commonwealth has an obligation to disclose the terms of any agreement, promise, or inducement proffered to a testifying witness before trial, and that a failure to do so may violate the defendant's right to due process. See, e.g., *Commonwealth* v. *Birks,* 435 Mass. 782, 787 (2002). The defendant claims that he was denied his right of confrontation at trial because the prosecutor misled the jury concerning the terms of the Commonwealth's agreement with its key witness, Jose Pacheco. As a result, he says, the jury were not given the correct and necessary information with which to make a fair assessment of Pacheco's credibility.

The defendant presents this claim in two sections: (1) the prosecutor misled the jury by indicating that Pacheco would be tried on the murder charges pending against him, even though the prosecutor must have known that this was not likely to occur; and (2) the prosecutor permitted Pacheco to obfuscate the terms of the cooperation agreement between them, an error that the defendant's counsel failed to correct. The implicit underpinning of both sections is the contention that there was an undisclosed, tacit agreement between Pacheco and the Commonwealth that contemplated the dismissal of the charges against Pacheco after he testified at the trials of his various codefendants. We address this underlying contention first.

Before testifying as a witness in any of the trials, Pacheco had entered into a written agreement with the Commonwealth that stated: "Your cooperation will be taken into consideration by this office. Your complete and truthful testimony will benefit

you upon disposition of your case. It is our intention to treat you fairly." The Commonwealth provided the defendant's counsel with a copy of this agreement in discovery long before his trials. However, the defendant asserts this written agreement did not represent the entire understanding between Pacheco and the Commonwealth. The defendant points to the following facts: only five weeks after the defendant's second trial, the attorney representing Pacheco on the indictments against him moved to dismiss the charges; the prosecutor mounted, in the defendant's words, only a "pro forma" objection to that motion; and when the motion was thereafter allowed, the Commonwealth did not appeal from the ruling. In the defendant's view, these events convincingly support the existence of a secret agreement between Pacheco and the Commonwealth concerning the disposition of Pacheco's charges at the time of the defendant's trial.

The difficulty confronting the defendant here is that the judge, after an evidentiary hearing on the defendant's new trial motion, specifically found there was no tacit or sub rosa agreement between Pacheco and the Commonwealth, and that "[w]hat was brought to the jury's attention in the defendant's case was that which the Commonwealth had [in fact] promised to Pacheco in exchange for his testimony." The judge found "highly credible" the testimony provided by both Pacheco's attorney and the assistant district attorney about the events leading up to the dismissal of the indictments against Pacheco.[4] That testimony established to her satisfaction that there had been no agreement

[4]Pacheco's attorney, Charles Stephenson, testified at the motion hearing that from the beginning of his representation of Pacheco, he had considered Pacheco to be more a victim of duress than a willing joint venturer in the murders and had contacted the district attorney of Hampden County early on to propose the dismissal of the charges against his client. The district attorney rejected the idea, offering Pacheco an opportunity to plead guilty to murder in the second degree, a result Mr. Stephenson thought inappropriate. Mr. Stephenson thereafter proceeded with his strategy of building a defense based on duress, and believed that Pacheco's cooperation with the Commonwealth — including testifying at the trials of Pacheco's codefendants as to the events leading up to the murders — would assist in establishing this defense. While Mr. Stephenson was likely to have communicated his asserted duress defense to Howard Safford, the assistant district attorney, he had no agreement with the district attorney's office about it. Mr. Safford similarly testified that the cooperation agreement was always no more than what its written words stated, a commitment to provide "consideration" to Pacheco on the disposition of his case, but no specification

at any time between Pacheco and the Commonwealth about the dismissal of Pacheco's charges. Rather, when Pacheco's counsel filed the motion to dismiss the charges following the defendant's trial, the Commonwealth opposed the motion,[5] and a judge in the Superior Court granted the motion after hearing from both Pacheco's counsel and the assistant district attorney.

The defendant is left with arguing that the judge's findings on the motion for a new trial are not substantiated, and suggesting that the attorney witnesses who testified were less than candid. However, the motion record amply supports the judge's findings; we leave undisturbed the judge's determinations about the credibility of witnesses testifying before her.[6] See *Commonwealth* v. *Schand*, 420 Mass. 783, 787 (1995); *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). In light of the judge's findings, the defendant's "implied contention that some undisclosed inducement existed which, if exposed to the jury, would render [Pacheco's] testimony less credible, is nothing but surmise." *Commonwealth* v. *Jackson*, 428 Mass. 455, 458 (1998).

We return to the two sections of the defendant's claim. The

of what that consideration would entail. Until he received Pacheco's motion to dismiss, Mr. Safford had not focused much attention on the resolution of Pacheco's charges or the possibility that they might be dismissed, and at the time of the defendant's trials, Mr. Safford thought there was a "distinct possibility" that he would be trying Pacheco on the murder indictment.

[5]The Commonwealth took the position that duress could not be raised as a defense to murder as a matter of law. At the time Pacheco filed his motion to dismiss in 1993 (and thereafter), the law was far from clear that duress was a valid defense to murder. See *Commonwealth* v. *Robinson*, 382 Mass. 189, 200-206 (1981) (assuming, without deciding, that duress available as defense to homicide). See also *Commonwealth* v. *Allen*, 430 Mass. 252, 255-256 (1999) (same).

[6]Although Pacheco recanted his trial testimony in his testimony at the hearing on the motion for a new trial, the judge "firmly reject[ed]" his recantation, finding "little question that [it was] an effort to improve his lot among some of his fellow inmates, rather than a genuine desire to tell the truth." (At the time of the motion hearing, Pacheco was serving a sentence on offenses unrelated to this case.) The judge also pointed out that Pacheco's trial testimony describing the murders agreed with the forensic evidence, and her conclusion is further supported by the essential uniformity of Pacheco's accounts of the murders beginning with his first statement to the police the day that they happened and extending through five trials. See *Commonwealth* v. *Jackson*, 428 Mass. 455, 458 (1998) (noting consistency of witness's account in rejecting defendant's allegation of undisclosed inducement).

defendant first focuses on the prosecutor's statement during closing argument that "[i]t's up to the court to decide" on Pacheco's guilt or innocence; he asserts that the statement inaccurately indicated to the jury that Pacheco would stand trial on the murder charges against him, when the prosecutor had to have known that this was unlikely to occur. There are two problems with the defendant's position. First, the evidence presented at the hearing on the motion for a new trial supports the good faith of the prosecutor's statement. As just discussed, the motion judge found that there was no agreement that Pacheco's charges would be dismissed, and she credited the prosecutor's testimony that at the time of trial he thought the witness might well go to trial on the murder charges against him. See *id.* at 458 (prosecutor did not mislead jury in stating that critical prosecution witness would be tried for murder where, after conviction of defendant, judge dismissed charges against witness for lack of sufficient evidence).

Second, the defendant has removed the prosecutor's words from their proper context. The defendant's trial counsel had argued in his closing, among other points of attack on Pacheco's credibility, that Pacheco was the shooter. The prosecutor's quoted statement that the defendant now challenges was part of a longer response to the defense counsel's argument about Pacheco.[7] Considered as part of this larger whole, the quoted statement may reasonably be understood as making the point that there is a distinction between the role played by the police — who are responsible for bringing charges against a person based on the evidence they have gathered — and the role played by the court process, where the person's guilt or innocence is determined. This is not a commitment on the prosecutor's part to try Pacheco for murder in the first degree; rather, it is an explanation that seeks to clarify for the jury that the charges against Pacheco are not conclusive of his role in the murders and that they, as the triers of fact, are free to decide whether to accept his account as truthful. There is nothing inaccurate or improper about the statement. Cf. *Commonwealth* v. *DeCicco,*

---

[7]The prosecutor told the jury, "You decide if Pacheco pulled the trigger, or just drove the car. He's one of the three listed there, ladies and gentlemen, he's charged, ladies and gentlemen, because he told the police he's the one that drove them down there. It's not for the police to decide whether or not he was involved or not. It's up to the court to decide, ladies and gentlemen."

51 Mass. App. Ct. 159, 160 n.1 (2001) (suggesting that prosecutor improperly stated explicitly to jury that witness would be tried for murder following defendant's trial, although thereafter, prosecutor agreed to reduce witness's charge to manslaughter in exchange for plea; court concluded, however, that issue was waived).

The defendant next asserts that the prosecutor did not fully or accurately lay out for the jury the terms of the cooperation agreement between Pacheco and the Commonwealth. The terms of the written agreement are unquestionably vague, but the fact that an agreement existed was before the jury. The prosecutor specifically brought out that the agreement between Pacheco and the Commonwealth provided that Pacheco would receive "consideration." The defendant's counsel then elicited testimony from Pacheco that he was charged with two counts of murder in the first degree in this case, punishable by life imprisonment without parole; that after Pacheco had testified against two of the other codefendants, he was released on personal recognizance and his original bail of $2 million was "reduced to nothing"; that various law enforcement officers had contributed logistically and financially to moving and protecting Pacheco's family; and that he hoped not to serve any time in prison beyond the ten months he had been held before his release.[8] Contrast *Commonwealth* v. *Hill*, 432 Mass. 704, 711-714 (2000) (new trial granted where Commonwealth failed to disclose agreement with key prosecution witness concerning disposition of charges, and permitted witness to mislead jury about sentencing expectations and motive for testifying). Because the essence of Pache-

---

[8]The defendant contends that Pacheco's response to the prosecutor's question about what "consideration" meant — "I don't know, they probably will recognize, you know, that I have been saying the truth since day one, all along" — inaccurately downplays the weight of the consideration he was being provided. While Pacheco's answer was nonresponsive, the evidence before the jury summarized in the text would allow them to view Pacheco's release from jail and other assistance as indicative of the consideration the Commonwealth was actually offering him. In addition, the judge brought to the jury's attention the issue of inducement by instructing them to consider, in assessing credibility, whether any witness had an interest, bias, or motive for testifying in a particular way and whether there were "any inducements and promises, or perceived inducements or promises that may have led to changes in testimony." See *Commonwealth* v. *Jackson*, 428 Mass. at 459. Cf. *Commonwealth* v. *Birks*, 435 Mass. 782, 787-788 (2002).

co's inducement to testify was before the jury, there was no error in the denial of the motion for a new trial.[9] See *Commonwealth* v. *Birks*, 435 Mass. at 787-788. Contrast *Commonwealth* v. *O'Neil*, 51 Mass. App. Ct. 170, 178-183 (2001) (finding defendant's counsel ineffective for failing to bring to jury's attention during trial main prosecution witness's written agreement for leniency in exchange for testimony).[10]

c. *Alleged improper admission of evidence.* The trial included a substantial amount of evidence relating to the operations of the Ramos drug organization, which the judge admitted as background evidence and relevant to motive. On appeal, the defendant does not challenge the general ruling,[11] but claims that two pieces of this "motive" evidence were admitted im-

---

[9]The defendant makes much of the fact that while the cooperation agreement uses the terms "consideration" and "benefit," the jury heard only about the term "consideration," and not "benefit." Although these two words may mean something different in many contexts, in Pacheco's cooperation agreement, with its reliance on general and vague terms, it is difficult to identify any substantive distinction between the terms.

At the oral argument in this case, counsel for the defendant asserted that because Pacheco's charges of murder in the first degree carried a mandatory life sentence without parole, the cooperation agreement's promise of a "benefit . . . *upon disposition* of your case" (emphasis added) must at a minimum mean that the Commonwealth would agree to reduce the charges from murder in the first degree to murder in the second degree. To the extent this argument raises a factual issue, it appears to be answered by the findings of the motion judge that there was no agreement between Pacheco or his counsel and the prosecutor on a possible disposition of his charges. Furthermore, as indicated above (see note 4, *supra*), the record reveals that when Pacheco was first indicted on the charges of murder in the first degree, the district attorney conveyed an offer to have Pacheco plead guilty to murder in the second degree, an offer Pacheco, through counsel, rejected. It seems unlikely in these circumstances that the Commonwealth would nonetheless be committing itself to reduce the charges against Pacheco to murder in the second degree without the promise of a guilty plea.

[10]While we conclude in this case that the defendant was not deprived of his right of confrontation or a fair trial in connection with the Commonwealth's cooperation agreement with its key witness, this is one of several cases raising fair trial issues in relation to the same cooperation agreement, which appears to be a standard agreement that the district attorney in Hampden County uses as a matter of policy. See *Commonwealth* v. *Birks*, 435 Mass. at 785-789; *Commonwealth* v. *Hill*, 432 Mass. 704, 709-717 (2000).

[11]We upheld the admission of similar evidence concerning the Ramos drug operation at the trials of Rivera and Diaz. See *Commonwealth* v. *Rivera*, 424 Mass. at 273; *Commonwealth* v. *Diaz*, 422 Mass. at 273.

properly. Specifically, he objects to (1) the testimony of Ramos associate David Soto that he lent a gun to the defendant "so he could go shoot Moe"[12] and that the defendant "shot at Mo[e] and missed"; and (2) the testimony of fellow inmate Frederick Suttles that the defendant told him that he used to sell a type of heroin that "supposedly . . . killed some people." The defendant argues that the failed attempt to shoot "Moe" and the sale of lethal heroin have no arguable connection to the Ramos drug operation, and certainly no connection to a claim that his ties to the Ramos organization provided a motive for his involvement in the two victims' murders. We review the admission of the evidence for prejudicial error.[13] Although we find error in both instances, we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s]." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

Soto's testimony, that he lent the defendant a gun, falls into the category of permissible motive evidence because Soto claimed he did so in the context of recruiting the defendant to join Ramos's organization. See *Commonwealth* v. *Diaz*, 422 Mass. at 273 (no error to admit testimony, on issue of motive, that defendant had earlier discussed possibility of killing competitor of Ramos as way of moving up in Ramos's organization). However, the testimony that the defendant planned to and did

---

[12]Neither the identity of "Moe" nor "Moe's" possible connection to anyone involved in this case was explained at trial.

[13]Early in the trial, the judge ruled that she would allow the admission of evidence concerning drugs, guns, and the Ramos organization on grounds of motive, and she permitted the defendant's counsel to make a standing objection to this evidence. The defendant contends that this continuing objection applies to the challenged testimony, so that its admission should be analyzed under the prejudicial error standard. The Commonwealth disputes that the standard applies to Suttles's testimony about heroin, but its argument — apparently based on the fact that no heroin was found in the searches of Ramos's two apartments — lacks merit. In the circumstances of this lengthy trial, where the defendant had already objected that the extensive evidence of guns and drug activity was prejudicial, he was not required to object separately to either challenged statement.

Defense counsel also lodged a separate, unspecified objection to the first instance of the testimony as to the defendant's intent to shoot "Moe."

use the gun for the purpose of shooting "Moe" does not bear on his relationship with Ramos's group. Likewise, the testimony of Suttles, that the defendant had sold heroin that "supposedly . . . killed some people," does not help to establish a connection to the drug ring. Admission of these statements therefore constituted error.[14] Nevertheless, several factors combine to convince us that this evidence was not fatal to the validity of the verdicts. The defendant was not charged with shooting either victim, a point the prosecutor made clear. Further, the prosecutor did not rely on either piece of evidence in his closing argument. Compare *Commonwealth* v. *Francis*, 432 Mass. 353, 365 (2000) (noting prosecutor's lack of reference to improperly admitted evidence in closing argument, in finding that error did not warrant new trial), with *Commonwealth* v. *Flebotte*, 417 Mass. at 353 (finding prejudicial error in part because prosecutor relied on improperly admitted evidence in closing argument). The judge made clear in her instructions to the jury that they were to consider the evidence of "drug activities" strictly in relation to motive, and she took care during voir dire to screen the jury pool for bias against drug activity and guns. See *Commonwealth* v. *John*, 442 Mass. 329, 338 (2004) (jury instructions and voir dire as to bias served to "minimize the prejudicial effect that gang evidence might have had on the jury"). Finally, the objectionable evidence consists of three fleeting references in the course of seven days of testimony and a great deal of evidence supporting the jury's verdicts. We conclude that the judgment in this case "was not substantially swayed by the error[s]." *Commonwealth* v. *Flebotte*, *supra* at 353.

d. *Denial of second motion for a new trial.* Last, the defendant objects to the denial without an evidentiary hearing of his second motion for a new trial. The theory of the motion was that jail housing arrangements made it impossible for the defendant ever to have met Frederick Suttles, who testified to admissions that he claimed the defendant had made to him in jail, and that the defendant's trial counsel was ineffective for failing to investigate this assertion. In denying the motion, the judge called Suttles's testimony "probably the last in terms of importance" and "es-

---

[14]The Commonwealth acknowledged at oral argument that the lethal heroin evidence should not have been admitted.

sentially devoid of detail." The defendant contends, nevertheless, that the potential to discredit Suttles completely would have improved his case significantly, and that he is entitled to discovery and an evidentiary hearing to determine whether conclusive evidence that they had never met was available, and to assess the reasonableness of his trial counsel in failing to investigate the matter.

The decision whether to hold an evidentiary hearing is within the motion judge's discretion; the judge may rule on the motion for a new trial without a hearing "if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). See *Commonwealth* v. *Denis*, 442 Mass. 617, 628 (2004). Our review focuses on whether there was an abuse of discretion. *Commonwealth* v. *Candelario*, 446 Mass. 847, 858 (2006).

The defendant supported his motion with two affidavits. The first, from the defendant himself, stated that the housing and recreational arrangements in the jail where he was held pending trial prevented him from ever coming in contact with Suttles and that he had informed his trial counsel of this fact. The second affidavit, from the defendant's appellate counsel, stated that trial counsel told her that he did receive this information from his client but did not investigate it because he believed that he could discredit Suttles by other means. The judge was entitled to discredit the defendant's own statement as self-serving and to ignore the hearsay statement of trial counsel contained in appellate counsel's affidavit. See *Commonwealth* v. *Goodreau*, 442 Mass. 341, 351 & n.6, 353-354 (2004). See also *Commonwealth* v. *Grant*, 426 Mass. 667, 673 (1998) ("The judge, of course, had the right to reject as not credible the defendant's self-serving, conclusory affidavit").

Suttles's testimony was cumulative of the testimony of other witnesses except in two particulars: the defendant had told Suttles that he had driven to the scene of the murders in a red truck; and the defendant had talked about planning to kill a witness, Yolanda Reyes, to prevent her from testifying against him and his codefendants. As the judge made clear in her instructions, however, presence at the scene of the murders is not an element of the crime of accessory before the fact. Furthermore,

the judge admitted the testimony regarding the plan to kill Yolanda Reyes only on the issue of consciousness of guilt and instructed the jury that they could not convict solely on evidence suggesting consciousness of guilt. In addition, the defendant's counsel discredited Suttles by thoroughly cross-examining him regarding his potential bias or motive to testify falsely and by presenting an alternate theory to account for his knowledge of the case.[15]

The issue is not whether we, in reading the record, might reach a different conclusion as to the weight of Suttles's testimony, but whether the motion judge, properly relying on her "knowledge and evaluation of the evidence at trial," abused her discretion in finding that the defendant's motion and affidavits failed to cast doubt on the effectiveness of his trial counsel. *Commonwealth* v. *Croken,* 432 Mass. 266, 271 (2000), quoting *Commonwealth* v. *Carver,* 33 Mass. App. Ct. 378, 381 (1992). See *Commonwealth* v. *Goodreau,* 442 Mass. at 355. We conclude that she did not, and we affirm the denial of the defendant's second motion for a new trial.

3. We have reviewed the entire record as required by G. L. c. 278, § 33E, and find no reason to reduce the convictions to a lesser degree of guilt or to order a new trial.

*Judgments affirmed.*

*Orders denying motions for a new trial affirmed.*

---

[15]Counsel brought out that Suttles spoke to the codefendant Diaz on a regular basis during Diaz's trial, and that Diaz related to Suttles the content of each day's testimony; the evidence introduced by the Commonwealth in the earlier Diaz trial mirrored in most respects the evidence introduced against the defendant in his trial.